People of the State of Illinois, Plaintiff-Appellee, v. Frank Hough, et al., Defendants-Appellants.

Gen. No. 52,562.

First District, First Division.

November 18, 1968.

Rehearing denied December 11, 1968.

George J. Cotsirilos and S. Jack Micheletto, of Chicago, for appellants.

John J. Stamos, State's Attorney of Cook County, of Chicago (Elmer C. Kissane and James R. Truschke, of counsel), for appellee.

MR. JUSTICE MURPHY delivered the opinion of the court.

In a two-count indictment, the three defendants, Frank Hough, Arthur Larson and Martin Kracht, together with Dominic Mazzone, were charged with murder in violation of chapter 38, section 9–1(a)(1) and section 9–1(a)(2), Ill Rev Stats 1963. On motion of the State, a severance for Mazzone was ordered, and he testified for the State. A jury found Hough, Larson and Kracht guilty of voluntary manslaughter, and each was sentenced to the penitentiary for a term of from nine to twenty years. The State then nolle prossed the indictment against Mazzone. The three defendants appeal.

A summary of the evidence shows that on May 25, 1966, Jerome Huey, a 17-year-old Negro boy, while scuffling with four white boys, Hough, Larson, Kracht and Mazzone, was hit on the head by one of the four with a baseball bat. He died from his injuries on May 29, 1966. At the time of the trial (March 1967), the three defendants were 19 years of age. Seventeen witnesses testified for the State; six witnesses, including the three defendants, testified for the defense.

On appeal, the three defendants contend:

I. The trial court erred in submitting a voluntary manslaughter verdict and instruction to the jury. Either the State's theory supported a verdict of murder, or the defense theory supported a verdict of not guilty. A voluntary manslaughter verdict was contrary to any interpretation of the evidence.

II. The defendants were denied a trial by an impartial jury in that prospective jurors having scruples against capital punishment were excused for cause.

III. As to defendants Kracht and Larson, the court erred in permitting into evidence post-occurrence inculpating statements by Hough and Mazzone made outside the presence of Kracht and Larson.

IV. The defendants were denied a fair and impartial trial by virtue of the prejudicial conduct of the prosecutors.

A. The Assistant State's Attorneys attempted to conceal from the jury that the accomplice and principal witness had knowledge of a promise to dismiss the charges against him in return for his testimony.

B. The cross examination of the defendant Kracht was calculated to hold him in disrepute and thus deny him a fair trial.

C. The arguments of the Assistant State's Attorneys were inflammatory and denied the defendants a fair trial.

The evidence shows that on May 25, 1966, at about 8:30 p. m., the three defendants and Mazzone, with a group of neighbors, were standing near the corner of 24th Place and Laramie in Cicero. All four boys had been drinking beer in an alley, and a car full of Negro

boys drove past the defendants, shouted obscenities at them and called them "white bastards." A few minutes later the defendants saw a Negro boy (Jerome Huey) crossing the street, and defendant Kracht said, "I think this is one of the boys, let's go talk to him." Defendant Kracht then took a baseball bat from his automobile "to protect myself in case any of his friends were around." As the boys proceeded down the street, Mazzone ripped an aerial from a parked car. Mazzone testified that as the four neared Huey, Huey came at him with a radio antenna, and they engaged in a fight, striking at each other with two aerials. While Larson and Huey were wrestling, one of the boys (the evidence is in conflict as to which one) struck Huey on the head with the baseball bat. At this point, Eugene Thompson, a Negro who observed the fight, shouted at the boys and approached them with a board in his hand. The four then ran back to where Kracht's automobile was parked and drove away.

Dominic Mazzone testified for the State. He stated that when the Negro boy walked past the car Kracht said, "Let's get that colored guy," and took a bat from the trunk, and the four boys left the car together. Hough grabbed the bat from Kracht and said, "He's mine." Mazzone then took the bat from Kracht and said, "You don't need the bat, you'll kill him." Hough grabbed the bat back from Mazzone and again said, "He's mine." Mazzone further said that he and Huey were swinging aerials at each other and as they were "sword fighting at each other," Larson jumped on Huey, and they both wrestled to the ground. Then Hough told Larson to get out of the way, and Hough hit Huey with the bat, once in the knees and once on the head. At that time a colored boy with a board in his hand said, "Leave that colored boy alone," and the four ran toward 25th Street, and the bat was still in Hough's hand. Later, Mazzone and Kracht approached Kracht's car where several persons were seated, and while Hough and Larson were about 20 feet away,

Mazzone said, "Get out of the car, I think we killed him." Everyone got out of the car, and the four got in and drove away. Mazzone also testified that on the evening of the occurrence he was wearing a white pancake hat.

Eugene Thompson, a State witness, testified that as he approached the scene, he picked up a board and yelled and kept running toward the group, he saw them run behind a filling station, and he kept going until a police officer stopped him.

Police Officer George Bahnick testified that he observed two white youths chasing Thompson, and one of the youths was wearing a small white hat and was carrying a baseball bat. Curtiss Voss, another witness to the event, testified he saw the bat being raised and struck against the victim by a boy wearing a light brown straw hat. Margo Dalessandro, a witness for the State, testified that she had seen the four boys in an alley drinking beer. When the four boys left the car, Kracht was still in possession of the baseball bat, which he had taken from the trunk of his car. About 15 or 20 minutes later, the boys ran back to the car from the south and they still had the bat, but she did not recall which of them was carrying it.

A witness for the defense, Jean Dalessandro, mother of Margo Dalessandro, testified that Hough, Kracht and Mazzone had already left the automobile and had disappeared from sight when she sent Arthur Larson after them, telling him to "go after the boys and stay out of trouble." She also testified that Mazzone was wearing a straw hat.

Defendant Larson testified in his own behalf. He stated that after the other three boys left in pursuit of Huey, he was standing beside the car talking with Mrs. Dalessandro. She "asked me to go and see what the boys were doing and not to get in any trouble." As Larson joined the group the fight was about to begin. "Dom-

inic had just gone up to the boy and started hitting him. And the boy hit him. When the boy hit him, he started backing off, when they started swinging at each other. . . . I came off the sidewalk into the street and I tried to get between them. I pushed the colored boy with my left hand and Dominic with my right hand and the colored boy started swinging at me and he hit me on the side of the head with the aerial. He hit me once. Then I turned to face him and I grabbed him. I just threw my arms around him. We both fell to the ground. I fell on top of him and we were just wrestling. We were on the ground for just a few seconds. Then I heard somebody say, 'Get up, get up,' and I started to get up and the colored boy started to get up with me."

On cross-examination, he testified that when he got up he saw the bat for the first time, and it was in Mazzone's hand. Later, Mazzone had the bat when he came back to the car. Larson further testified, "I did not have any other reason to touch that colored boy except that I saw him fighting with Dominic Mazzone. I tried to break up the fight. I had seen Dominic and him fighting with the aerials. Besides that fight, besides my own wrestling, I did not see anyone else touch him at any time. I was paying attention to the second colored fellow who came along with the board in his hand."

Defendant Kracht testified that when he saw Huey walk past his car, he said to his group, " 'I think this is one of the boys, let's go talk to him.' I took the bat out of the car to protect myself in case any of his friends were around."

Defendant Hough testified that as the four boys walked south on Laramie, he said to Kracht, "I don't think we need a bat." Kracht then gave him the bat. When they got to 25th Place, Mazzone was fighting with "the colored kid." Each one of them had an aerial, and they were swinging at each other. Larson ran in between them,

and "the colored boy hit him with the aerial." Larson threw his arms around Huey, and they fell to the ground. Mazzone grabbed the bat and hit the colored boy (Huey) two or three times as he started to get up. A second colored boy came on the scene with a board in his hand, and Mazzone ran after him with the baseball bat. At that time Mazzone was wearing a white straw hat. Later, Mazzone came back to the car and said, "Let's get out of here, I think I killed him."

Considered first is the contention that it was reversible error to submit to the jury a voluntary manslaughter instruction and verdict. The record shows that both the State and the defense objected to the giving of the manslaughter instruction. It was a "court's instruction."

Defendants contend there was no evidence tending to prove manslaughter, and it was error to give such an instruction not based upon any evidence. They assert that if any crime was committed, it was wilful and deliberate murder and, therefore, it was error to give an instruction authorizing a verdict for a lesser offense. (People v. Schultz, 267 Ill 147, 158, 107 NE 833 (1915).) In People v. Newman, 360 Ill 226, 195 NE 645 (1935), it is said (p 231):

> "This court has often announced the rule that where the evidence is such that it admits of but one of two conclusions, either that the defendant is guilty of murder or is innocent, the giving of an instruction and form of verdict on manslaughter is improper, and where given at the request of the People amounts to error requiring a reversal of the judgment if the accused be found guilty of the lesser crime. . . . The rule often stated, and conceded by the People, is that if a sufficient time has intervened between the provocation and the killing to permit the voice of reason to be heard the crime cannot be manslaughter but if any crime is committed it is murder. . . . [I]t

seems clear to us that there is in the record no evidence upon which a manslaughter verdict could be based. The giving of this instruction was error requiring reversal."

The defendants argue that the evidence shows that Mazzone actually administered the fatal blows to the victim, and there was no joint undertaking to harm the Huey boy when they left the car, and at the time Mazzone deliberately struck Jerome Huey he was not coming to the aid of any of the three defendants. Defendants assert that the instruction on the subject of manslaughter was an intimation to the jury that if they were not satisfied the defendants were guilty of the only crime the evidence tended to show they could have committed, they might find them guilty of a lesser offense, notwithstanding there was no evidence to sustain the finding of guilty of the lesser offense.

The State concedes that a manslaughter instruction should not be given where the evidence supplies no ground on which the jury might find a defendant guilty of manslaughter. The State argues that it is equally true that in all criminal cases, a jury should be fully instructed on any theory of the law which they might reasonably find to be true from the evidence (People v. Izzo, 14 Ill2d 203, 151 NE2d 329 (1958)), and where there is any evidence in the record which, if believed by the jury, would justify it in finding a killing to be manslaughter rather than murder, the failure to give them instructions on manslaughter is reversible error. In People v. Jones, 384 Ill 407, 51 NE2d 543 (1943), it is said (p 412):

"It is also the rule in homicide cases that if there is evidence in the record which, if believed by the jury, would reduce the crime to manslaughter, an instruction defining that crime should be given. . . .

"To prove murder there must be proof showing that the killing was done with malice aforethought. . . . The common factor found in murder and manslaughter is the unlawful killing of a human being. The presence or absence of malice is the element which distinguishes murder from manslaughter."

See, also, People v. Canada, 26 Ill2d 491, 187 NE2d 243 (1962), and People v. Papas, 381 Ill 90, 44 NE2d 896 (1942).

Illinois Revised Statutes, c 38, § 9–2, defines voluntary manslaughter:

§ 9–2. Voluntary Manslaughter.] (a) A person who kills an individual without lawful justification commits voluntary manslaughter if at the time of the killing he is acting under a sudden and intense passion resulting from serious provocation by:

(1) The individual killed, or
(2) Another whom the offender endeavors to kill, but he negligently or accidentally causes the death of the individual killed.

Serious provocation is conduct sufficient to excite an intense passion in a reasonable person.

(b) A person who intentionally or knowingly kills an individual commits voluntary manslaughter if at the time of the killing he believes the circumstances to be such that, if they existed, would justify or exonerate the killing under the principles stated in Article 7 of this Code, but his belief is unreasonable.

(c) Penalty.

A person convicted of voluntary manslaughter shall be imprisoned in the penitentiary from one to 20 years.

■ As we view this case, it was not error for the trial court to submit to the jury an instruction and verdict on voluntary manslaughter. We think there was ample testimony upon which to find the defendants guilty of voluntary manslaughter. The three defendants had been excited by obscenities shouted at them by some Negro boys. There was testimony that some of them thought that Huey might have been one of them. Kracht wanted to talk with Huey but took along the bat for protection from Huey's friends. Mazzone testified that he was attacked by Huey with an aerial. Larson was trying to break up the fight when he was hit. Hough was carrying the bat, and when Huey started to get up from the ground someone took the bat and struck Huey. From the time the defendants saw Huey until he was fatally injured, there was no pause in the activities of the participants sufficient to show that the fatal blows were attributable to malice or revenge. There was no "cooling off period" for the "voice of reason to return." People v. Harris, 8 Ill2d 431, 434, 134 NE2d 315 (1956); People v. Walker, 55 Ill App2d 292, 299, 204 NE2d 594 (1965).

Considered next is defendants' contention that their right to a trial before an impartial jury and to due process of law was violated because the trial judge, at the State's request, disqualified for cause those prospective jurors who had religious or conscientious objections or scruples against the infliction of the death penalty. The record includes a stipulation by the parties that upon request of the State "the following question, or the substance thereof, was asked of each and every juror. 'Do you have any conscientious or religious objections against the infliction of the death penalty in the proper case?' " It was further stipulated that 115 jurors were disqualified for cause, a substantial majority of whom were disqualified at the State's request when they answered the foregoing question in the affirmative.

297

Defendants argue by the number of prospective jurors who were disqualified for cause, defendants were deprived of their right to be tried by a jury which was fairly representative of the community in which their trial took place. Defendants point out, "It may be urged by the appellee that since the jury did not fix the penalty at death here, nor did they return even a verdict of murder, that the defendants have no standing to complain. The appellee may also urge that the death penalty qualification of jurors is necessary in order to provide the prosecution with an impartial jury on the issue of *punishment*. The more fundamental point, however, is that systematic exclusion of jurors having scruples against capital punishment denies the defendants of a similarly impartial jury on the more fundamental issue of *guilt* or *innocence*."

█ We find no merit in this contention. Witherspoon v. Illinois, 391 US 510 (1967), supplies the guidelines to be used here. On the issue that a jury which had been qualified on the death penalty was more likely to convict, the Supreme Court said (p 516) :

> "The petitioner contends that a State cannot confer upon a jury selected in this manner the power to determine guilt. He maintains that such a jury, unlike one chosen at random from a cross-section of the community, must necessarily be biased in favor of conviction, for the kind of juror who would be unperturbed by the prospect of sending a man to his death, he contends, is the kind of juror who would too readily ignore the presumption of the defendant's innocence, accept the prosecution's version of the facts, and return a verdict of guilt. To support this view, the petitioner refers to what he describes as 'competent scientific evidence that death-qualified jurors are partial to the prosecution of the issue of guilt or innocence.'

298

"The data adduced by the petitioner, however, are too tentative and fragmentary to establish that jurors not opposed to the death penalty tend to favor the prosecution in the determination of guilt. We simply cannot conclude, either on the basis of the record now before us or as a matter of judicial notice, that the exclusion of jurors opposed to capital punishment results in an unrepresentative jury on the issue of guilt or substantially increases the risk of conviction. In the light of the presently available information, we are not prepared to announce a per se constitutional rule requiring the reversal of every conviction returned by a jury selected as this one was.

"It does not follow, however, that the petitioner is entitled to no relief. For in this case the jury was entrusted with two distinct responsibilities: first, to determine whether the petitioner was innocent or guilty; and second, if guilty, to determine whether his sentence should be imprisonment or death. It has not been shown that this jury was biased with respect to the petitioner's guilt. But it is self-evident that, in its role as arbiter of the punishment to be imposed, this jury fell woefully short of that impartiality to which the petitioner was entitled under the Sixth and Fourteenth Amendments."

Defendants Kracht and Larson next contend that the court erred in permitting into evidence post-occurrence inculpating statements by Hough and Mazzone, made out of the presence of Kracht and Larson. This point is based upon the testimony of State's witness Henry Salazar, who stated that Mazzone and Hough, after the incident, and out of the presence of Larson and Kracht, said they had just "whipped a Nigger" and "Yeah, we beat him up"; also, that Mazzone said, "I whipped him," and

Hough again said, "Yeah, we beat him up," out of the presence of Kracht. The court instructed the jury that these statements could not be considered in relation to Larson and Kracht.

Defendants assert that "under no construction of the law could these statements be considered to be in furtherance of the conspiracy alleged by the State, and, therefore, admissible against Kracht, for these statements were allegedly made after the incident." Defendants cite Krulewitch v. United States, 336 US 440 (1949), where it is said (p 442):

> "This hearsay declaration, attributed to a co-conspirator, was not made pursuant to and in furtherance of objectives of the conspiracy charged in the indictment, because if made, it was after those objectives either had failed or had been achieved. Under these circumstances, the hearsay declaration attributed to the alleged co-conspirator was not admissible on the theory that it was made in furtherance of the alleged criminal transportation undertaking."

Also, United States v. Gordon, 253 F2d 177 (1958), where it is said:

> "It is evident that this testimony could not have been other than damaging and prejudicial to Gordon. . . . Numerous cases are cited which have embraced the fanciful theory that any damage done to Gordon was cured by the court's admonition to the jury. . . . As the late Justice Jackson stated in his concurring opinion in Krulewitch v. United States, 336 US 440 . . . : 'The naive assumption that prejudicial effects can be overcome by instructions to the jury, . . . all practicing lawyers know to be unmitigated fiction.' "

300

In People v. Patris, 360 Ill 596, 196 NE 806 (1935), it is stated (p 601):

> "The court instructed the jury to disregard the testimony as to the admissions of Currin made out of the presence of Patris, but the instruction could not cure the damage already done. While, theoretically, the instruction withdrew the evidence from the consideration of the jury, nevertheless, the prejudicial effect of the testimony inevitably remained."

On this point we think the guidelines are to be found in United States v. Gardner, 347 F2d 405 (1965), where it is said:

> "In a joint trial, incriminating statements made by one defendant which mention another defendant and his conduct are admissible into evidence but only against the declarant. This is also true of a written confession by one defendant which names joint defendants. . . . Such evidence is hearsay but it is admissible as to the declarant under the admission against interest exception to the hearsay rule. . . . The trial court should be careful at the time of the admission of such evidence and by its instructions make clear to the jury that the evidence is limited to the declarant only and is not to be considered as to other defendants."

 As to the cautionary instruction by the court to "make clear to the jury that the evidence is limited to the declarant only and is not to be considered as to other defendants," we believe it is not necessary to speculate here whether the warning given to the jury was sufficient. The remarks made in Lutwak v. United States, 344 US 604 (1953), apply here:

> "In view of the fact that this record fairly shrieks the guilt of the parties, we cannot conceive how this one

301

admission could have possibly influenced this jury to reach an improper verdict. A defendant is entitled to a fair trial but not a perfect one."

We find no error here.

Next considered is the contention that defendants were denied a fair and impartial trial by the prejudicial conduct of the prosecutors in three areas. The first charge is that the State attempted to conceal from the jury that Mazzone had knowledge of a promise to dismiss the charges against him in return for his testimony.

On the redirect examination of Mazzone by the State, he testified that he was not promised anything by the State for his testimony, and that he had not spoken to any member of the State's Attorney's office. Jack G. Stein, Mazzone's attorney, was called by the defense, and he invoked the lawyer-client privilege with respect to his conversations with his client, Mazzone. Stein testified that an assistant State's Attorney told him that the charges against Mazzone would be dropped if he became a State's witness, and when the case was over that was what he (Stein) expected. On cross-examination by the State, Stein denied that he had told Mazzone what would happen after he testified. Stein also stated, "Well, again, what I told him, I don't care to state, Mr. Nellis. I think that is between my client and myself, and he may broadcast it to the world, but I don't feel that I have the right to tell what I spoke to him and what he spoke to me. You can ask me anything you want about any other question and I will be happy to answer it."

The defense also points out that in the final argument, the assistant State's Attorney asked the jury of Mazzone, "But is his testimony worthy of belief? And that, ladies and gentlemen, is your job. Remember that when Mr. Stein testified, he testified that he didn't tell Mazzone of any deal. That he told him: 'Your only salvation lies in telling the truth and to pray. And I'll take care

302

of the rest.' That's what Mazzone said on the stand. That's what Mr. Stein said on the stand."

The defendants argue that the State attempted to bolster Mazzone's truthfulness and reliability by having them believe that the only inducement for him to testify was his desire to tell the truth, and that Mazzone was testifying "from a sense of what was right and honorable and, therefore, he was worthy of belief." Defendants cite Napue v. Illinois, 360 US 264 (1959), where it is said (p 269):

> "The jury's estimate of the truthfulness and reliability of a given witness may well be determinative of guilt or innocence, and it is upon such subtle factors as the possible interest of the witness in testifying falsely that a defendant's life or liberty may depend."

And further (p 270):

> "[W]e do not believe that the fact that the jury was apprised of other grounds for believing that [the witness] may have had an interest in testifying against petitioner turned what was otherwise a tainted trial into a fair one. . . . Had the jury been apprised of the true facts, however, it might well have concluded that [the witness] had fabricated testimony in order to curry the favor of the very representative of the State who was prosecuting the case in which [the witness] was testifying."

Defendants also cite People v. Coddington, 31 Ill2d 468, 202 NE2d 509 (1964), where it is said (p 471):

> "It is impossible to truly assess the effect that a truthful disclosure of King's interest in testifying on behalf of the prosecution here would have had on the court. . . . [W]here a conviction rests on the testimony of an accomplice who has been promised parole and who was thoroughly impeached, it must be re-

303

versed. Defendant was not afforded a fair trial as guaranteed by the constitution and his conviction must be set aside."

As we examine this record on this point, we find no fundamental concealment from the jury of the relevant facts of the Mazzone deal. The State's Attorney in closing said, "The price that we pay is the release of one murderer for the conviction of three. There was a conspiracy and they are all guilty. Frank Hough is the one who had the bat, but they are all guilty, Mazzone, as well as the rest." As argued by the State, there is nothing in the record to indicate that the State knew anyone was lying or that Mr. Stein lied on the stand. These matters were rightfully left for the jury to determine. As said in People v. Nash, 36 Ill2d 275, 284, 222 NE2d 473 (1966):

> "There is a material difference in the Napue and Lueck cases and this case, however. In Napue and Lueck the prosecutor did nothing to correct the false testimony and the false testimony was unknown to the defendant at the time of the trial. Here the defendant knew of the false testimony and evidence was presented to show that promises of leniency had in fact been made. Under these circumstances there has not been a denial of due process of law."

■ Although it seems unlikely that Mazzone was not informed as to the agreement to dismiss the charges against him in return for his testimony for the State, there is little in the record to support the contrary conclusion. As the jury was informed as to "the price" to be paid for his testimony, we find no prejudicial error here.

The next charge of prejudicial conduct is the assertion by defendant Kracht that his cross-examination by the State was conducted so as to discredit him in the eyes of

the jury. On direct examination, Kracht testified that after he was honorably discharged from the Marine Corps, his main business was that of a roofer. He was then cross-examined by the State as to how long he was in the Marine Corps and as to his various employers.

From this it is argued on Kracht's behalf that the prosecutor attempted by inference to show that because he went from job to job, he was an unstable character. It is also argued that questions regarding the length of his Marine Corps service "left an insinuation that perhaps the prosecutor had some information that the defendant was discharged in other than an honorable manner. The failure of the prosecutor to follow up this line of questioning with any proof that the defendant was in fact discharged dishonorably was highly prejudicial to the defendant Kracht as well as all other defendants who were on trial with him." It is asserted that his direct examination in this area "far from justified this marked departure from proper cross-examination." Defendants cited People v. Smith, 74 Ill App2d 458, 221 NE2d 68 (1966) ; People v. Lewis, 313 Ill 312, 145 NE 149 (1924) ; and People v. Wilson, 400 Ill 461, 81 NE2d 211 (1948), where the defendant was questioned about being A. W. O. L. from the army, and the court held that such a line of inquiry was improper and stated (p 479) :

> "It requires no citation of authority to hold this was highly improper, and doubtless highly prejudicial in a case where the evidence is of a very doubtful character.
>
> ". . . Notwithstanding the court sustained the objection, the fact remains that his reputation as a good citizen was questioned by insinuations in the presence of the jury, through improper questions of the assistant State's Attorney."

■■■■■■■

The record shows an extended conference on this matter between court and counsel, out of the presence of the jury, in which the prosecutor offered to prove that Kracht had lied about his length of service before he was honorably discharged. At that time the court remarked that the State had a right to examine the defendant as to how long he was in the Marine Corps, "but the question as to whether or not he was honorably discharged, unless you can prove he was dishonorably discharged you should keep away from that." A motion for a mistrial was denied, and following the court's instruction the prosecutor, in the presence and hearing of the jury, asked defendant Kracht how long he was in the Marine Corps. Again in cross-examination regarding Kracht's filling out an application for employment, the question was put, "And at that time did you list your military service on the application?" In a conference out of the presence of the jury, the State offered to prove that in the application for employment Kracht stated that "he entered the United States Marines on July 29, 1962, and that he was discharged in September 25, 1964," and that he had actually served from July 29, 1964, to September 25, 1964, and that "there is no contradiction that he was discharged under honorable conditions." The court sustained an objection to this line of questioning, and the cross-examination continued as to his activities on the night of the incident.

■■ We have examined defendants' authorities and because of factual differences we are not persuaded they apply here. Limits on cross-examination rest soundly in the discretion of the trial judge. In People v. McCain, 29 Ill2d 132, 193 NE2d 784 (1963), it is said (p 134):

> "Our holdings have vested the trial court with a substantial discretion as to the range of the cross-

examination, and we will not interfere with its exercise in the absence of its clear abuse, . . . which is not here apparent."

In our opinion, the cross-examination of Kracht was within the scope of his direct examination, and we find no abuse of discretion here.

Defendants' last contention is that the State's final argument was inflammatory and denied defendants a fair trial. Defendants assert, "Both prosecutors in their closing remarks attempted to inflame and arouse the jury's passions by making improper and prejudicial remarks to the jury." Defendants contend the State persisted in urging the jury that the only reason that Huey was killed was because he was "black," after the court had already sustained an objection to the same line of argument by one of the prosecutors. Defendants also charge that the State resorted to describing the death of Jerome Huey as "savage" on more than one occasion and called his killing an act of "animals." Defendants also assert the prosecutor tried to prejudice the jury by remarking, "Jerome Huey had a fine chance of making his family proud of him."

Defendants also contend that the argument for the State was improper—"In attempting to impress upon the jury that Mazzone was the best of the three defendants that the State could have selected to become an accomplice witness, the prosecutor stated: 'There was a serious decision to be made by the prosecutors in your county. The decision was to let four men walk free or to find out someone who would become an accomplice witness for the State, and so a bargain was made. After thorough study and discussions with the attorney for Mr. Mazzone, that bargain was made.' "

Defendants contend that these remarks were completely unwarranted and prejudicial to the defendants, since

the prosecutor went outside the record and referred to matters not in evidence. Defendants' authorities include People v. McLaughlin, 337 Ill 259, 169 NE 206 (1929), where it is said (p 265) :

> "It often has been held that the effect of remarks calculated to arouse the prejudices of the jurors against the defendant is not removed by striking the objectionable remarks. . . . A fair and impartial trial is guaranteed to all persons, whether innocent or guilty, and it is the duty of the courts to uphold this guaranty. . . . An accused person has a right to a trial by jury and the question is not whether a reviewing court may believe him innocent or guilty but what the jury's verdict would have been had the inflammatory remarks not been made. . . . In the present case it cannot be said that plaintiff in error was not prejudiced by the unwarranted remarks of counsel for the prosecution."

The State argues that the closing argument of the assistant State's Attorneys was proper and points out, "The defense isolates nine remarks made in almost 100 pages of closing argument" in the 1300 page record. The State asserts the remarks were based on the record, and an objection was sustained to each remark.

We have considered the conduct and the remarks complained of and, although such remarks as "savage" and acts of "animals" have been characterized as improper, we do not believe that the questioned conduct and remarks were so seriously prejudicial as to prevent the defendants from receiving a fair trial. (People v. Mackey, 30 Ill2d 190, 193, 195 NE2d 636 (1964).) We think the guidelines to be used here are set forth in People v.

Porter, 11 Ill2d 285, 143 NE2d 250 (1957), where the defendant was referred to as a "savage." There it is said (p 294):

"Although wide latitude in closing arguments is allowed, and it is not uncommon for a prosecuting attorney to denounce a defendant, and even indulge in invective predicated upon the State's interpretation of the evidence, nevertheless, this remark does skirt the bounds of propriety. However, in the light of all the facts and circumstances, it cannot, by itself, be deemed to constitute reversible error."

In our view, the instant case is not close on the facts, and we do not believe the objectionable parts of the State's final argument, including the reference to Huey's family, could have affected the verdict of the jury.

It is our conclusion that the defendants received a fair trial without prejudicial error. Therefore, the judgments of the Circuit Court of Cook County are affirmed as to all defendants.

Affirmed.

BURMAN, P. J. and ADESKO, J., concur.