THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* HOLICE BLACK *et al.*, Defendants-Appellants.

(No. 52109;

First District—December 21, 1970.

Gerald W. Getty, Public Defender, of Chicago, (Shelvin Singer and James J. Doherty, Assistant Public Defenders, of counsel,) for appellants.

Edward V. Hanrahan, State's Attorney, of Chicago, (Elmer C. Hissane, Lawrence J. Bolon, Anthony M. Montemurro, James W. Reilly, James W. Dempsey and Robert Best, Assistant State's Attorneys, of counsel,) for the People.

Mr. JUSTICE LYONS delivered the opinion of the court:

Two indictments were returned against the defendants, Holice Black and Richard Black. In a three-count indictment they were charged with the murder, by shooting, of Charles Eichorst, a sergeant in the Chicago Police Department, in violation of Ill. Rev. Stat. (1963), ch. 38, par. 9—1 (a—1), (a—2) and (a—3). The other indictment charged them with the armed robbery of Marilyn Moline in violation of Ill. Rev. Stat. (1963), ch. 38, par. 18—2. Since the acts complained of were part of one criminal transaction, the two indictments were consolidated for trial.

Shortly before 9:30 A.M. on August 4, 1965, the Treasure Island Food Store located at 2540 Lawrence Avenue in Chicago was held up and robbed by a man with a gun who took $3500 in cash from a safe. During the course of the robbery, Marilyn Moline, a cashier who was placing the money in the safe, managed to set off a silent police alarm. While the robber was stuffing a bag with the money, a long shrill whistle was heard from the front of the store, whereupon the robber departed in haste. Meanwhile, Sergeant Charles Eichorst of the Chicago Police Department, responding to the silent alarm, came upon a man running from in front of the store across the parking lot adjacent to the store. Sergeant Eichorst pursued the man, apprehended him and ordered him against the wall of the store. At this time another man came running from the store, observed the situation in the parking lot, fired at Sergeant Eichorst, and killed him. Thereafter the two men fled through several streets, alleys and gangways in the neighborhood of the shooting and disappeared.

The defendants were tried jointly by a jury and were both convicted of murder and armed robbery. Judgments were entered and, after their written motions for a new trial and in arrest of judgment were denied,

Holice Black was sentenced to 100 to 200 years for murder and 20 to 40 years for armed robbery, the sentences to be served concurrently. Richard Black received concurrent sentences of 75 to 100 years for murder and 20 to 40 years for armed robbery. The prosecution qualified the jury for the death penalty, but the jury did not recommend it.

In their joint appeal, the defendants, who are brothers, urge that the trial court committed reversible error by: (1) refusing to grant their written motion for a change of venue and by excluding jurors from service who were opposed to the death penalty; (2) refusing to enforce defense subpoenas of radio and television stations thru which the defendants sought additional evidentiary support of their motion for change of venue; (3) not granting the written motion for a continuance presented by appointed counsel for Holice Black on the day this case had been assigned for trial; (4) denying the defendants their right to a hearing on their motion to suppress evidence allegedly unlawfully seized and used against them at trial; and (5) denying Richard Black's written motion to suppress a written statement he had given to the court before trial in support of his *pro se* "Petition for Writ of *Habeus Corpus Ad Testificandum*." The defendants also allege faulty pre-trial identification procedures in violation of due process of law and improper conduct by the prosecutor which denied them a fair trial. The sufficiency of the evidence is not attacked in this appeal. At their trial, Holice Black was represented by appointed counsel, the Public Defender of Cook County, whereas Richard Black was represented by privately retained counsel. Neither of the defendants testified at the trial.

On the day this case had been assigned for trial, after several continuances had been granted to the defense, the defendants presented their written motion for a change of place of trial from Cook County or any of the counties adjacent thereto and alleged that all the newspapers, television stations, and radio stations in Chicago had, from the day of the homicide to the present time: (1) editorialized against them; (2) reported that they were the guilty parties to the exclusion of any other suspects; (3) presented human interest stories concerning the surviving family of the deceased police officer; and (4) presented the stories in such a way as to set out hearsay and other statements which would be inadmissible at the trial. This motion was signed by both defendants, supported by their affidavit, and had attached to it as exhibits many newspaper articles which had appeared in the Chicago press and copies of the messages which had been broadcast over various radio and television stations in Chicago. The motion for change of venue was taken under advisement and, after some *voir dire* had been conducted, the trial court denied it. The defendants have renewed the issue on appeal,

again asserting that the jurors were prejudiced by adverse newspaper, radio and television publicity.

We find no merit in this contention. It has been held that the examination of prospective jurors is, in a typical instance of pre-trial publicity, probably the most valuable means of ascertaining partiality or indifference among the array. (*People v. Kurtz* (1967), 37 Ill.2d 103, 108, 224 N.E.2d 817, 820.) The *voir dire* examination is included in the record before us. The examination of prospective jurors took approximately eleven court days whereas the trial of the case on the ultimate issues took approximately eight days. During *voir dire,* 222 prospective jurors were examined. Defense attorneys exercised fifty-seven of their sixty peremptory challenges before twelve acceptable jurors were selected. The State exercised thirty-five of their peremptory challenges and the court excused 114 prospective jurors for cause, largely because of opposition to the death penalty. In the selection of two alternate jurors, the defense exercised two additional peremptory challenges.

We have carefully examined the abstract and the over twenty-three hundred page transcript of the *voir dire* proceedings. We note that six of the twelve jurors had never heard of the case. The remaining six had heard or read of it and vaguely remembered the incident, but had no opinion of the guilt or innocence of the accused and stated that they would base their verdict solely on the evidence presented in the courtroom. In *Irvin v. Dowd* (1961), 366 U.S. 717, 723 and in *People v. Williams* (1968), 40 Ill.2d 522, 531—32, 240 N.E.2d 645, 650, it was held that it is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court. After a careful examination of the *voir dire* proceedings, we are of the opinion that the twelve jurors accepted by both sides were shown to be fair and impartial.

Further, we note that when the twelve jurors were sworn, the defendants had three unused peremptory challenges. This too suggests that the defense attorneys were of the opinion that the selected jury represented a fair and impartial trier of the facts. (*People v. Sleezer* (1956), 9 Ill.2d 57, 60—61, 136 N.E.2d 808; *People v. Williams* (1968), 40 Ill.2d 522, 531—32, 240 N.E.2d 645; and *People v. Speck* (1968), 41 Ill.2d 177, 184, 242 N.E.2d 208.) Moreover, it was shown during *voir dire* that the majority of the alleged prejudicial publicity was concentrated in the period immediately following the homicide, namely, from August 4, 1965, to sometime in September, 1965, some six months before the trial. We note from a reading of the newspaper articles and radio broadcasts contained in the Books of Exhibits presented to us that the arrest of Holice Black in Miami, Florida, in December, 1965, was reported ob-

jectively and impartially by the press as was the surrender of Richard Black later in December to FBI agents in Chicago. There was no media coverage of this case from the time the defendants were arraigned in January, 1966, to the time of their trial in July, 1966. Thus, the motion for change of venue was presented eleven months after the crime and seven months after the case had been assigned to the trial judge and the last story had been published by the press or other media in Chicago. In the absence of any proof by the defendant of the existence of actual prejudice, this time lapse alone may be considered sufficient to dissipate any feeling of prejudice in the community. *Beck v. Washington* (1962), 369 U.S. 541, 556; and *People v. Berry* (1967), 37 Ill.2d 329, 332, 226 N.E.2d 591. No such proof is found in the *voir dire* proceedings.

■■ The cases chiefly relied upon by the defense, (*Estes v. Texas* (1965), 381 U.S. 532; *Sheppard v. Maxwell* (1966), 384 U.S. 333; *Delaney v. United States* (1st Cir. 1952), 199 F.2d 107; *United States v. Accardo* (7th Cir. 1962), 298 F.2d 133, are factually distinguishable from the case at bar. In the cited cases, the prejudicial publicity occurred shortly before the trial and carried over to it or occurred during the trial itself. In another case relied upon by the defendants, (*Irvin v. Dowd* (1961), 366 U.S. 717, the defendant had exhausted his peremptory challenges and was unable to excuse for cause eight of the twelve jurors who admitted during *voir dire* that they thought the defendant was guilty of murder. These significant factors are absent in the case at bar. In view of the impartiality shown by the jurors in the *voir dire* proceedings, the time which had elapsed from the last news publication to the date of trial, and the fact that defense attorneys had not exhausted their peremptory challenges at the time twelve jurors were found to be acceptable by both sides, we hold that the trial court did not abuse its discretion in denying the motion of the defendants for a change of venue.

■■ We are also of the opinion that the trial court did not abuse its discretion in refusing to grant a continuance on motion of the defense when news of the Speck multiple slayings and rioting on the west side of Chicago was published in the news media during the *voir dire* proceedings. The defense asked only of three prospective jurors whether they could be impartial in light of the Speck publicity and only one prospective juror about the riots on Chicago's west side, which is where the defendants lived. Each prospective juror indicated that the publicity regarding these collateral events would not affect his impartiality. Additional safeguards against the effect of any prejudicial collateral publicity are found in the fact that this jury was sequestered throughout the trial and the jurors' exposure to newspapers and television news programs was censored by court personnel pursuant to order of the trial court. We

are of the opinion that the trial court was correct in not halting this trial because of the publicity given to these collateral matters.

■■ In support of their contention that they were deprived of a fair trial because of the exclusion of jurors who were opposed to the death penalty, the defendants rely upon *Witherspoon v. Illinois* (1967), 391 U.S. 510, and *Boulden v. Holman* (1969), 394 U.S. 478. Both of these cases are addressed only to the sentence imposed by such a jury, and hold that a sentence of death cannot be carried out if the jury that imposed or recommended it was chosen by excluding veniremen for cause simply because they voiced general objections to the death penalty or expressed conscientious or religious scruples against its infliction. Because the death penalty is not involved in the case at bar and there is nothing in the record to support the defendants' assertion that a jury inclined to impose the death penalty is also predisposed to return a guilty verdict, we reject this contention. See *People v. Hough* (1968), 102 Ill.App.2d 287, 298, 243 N.E.2d 520.

In light of our holding that the defendants were tried by a fair and impartial jury, we need not decide whether the trial court committed reversible error by refusing to enforce the subpoenas addressed to certain radio and television stations located in Chicago.

One of the defendants, Holice Black, urges that he was denied effective assistance of counsel because the trial court denied the motion of his counsel for a continuance. The record reveals that Holice Black was represented by five different attorneys, all but one of whom were appointed counsel, from the time of his arraignment to the time of his trial approximately six months later. At the arraignment, the Public Defender of Cook County was appointed. Two weeks later, this counsel was given leave to withdraw and new counsel, who had been personally selected by Holice Black, was appointed. He remained in the case for about 1½ months when he was given leave to withdraw and the Public Defender was again substituted, receiving from prior appointed counsel the results of the former's investigation. The Public Defender remained in the case for two months, until May, 1966, when he was given leave to withdraw and privately retained counsel entered his "tentative appearance." Less than two weeks later and approximately 1½ months before the trial, this private counsel withdrew and the Public Defender was again appointed.

The Public Defender of Cook County was present in court in May, 1966, when the trial court expressly informed him that no more continuances would be granted and the case would go to trial on or about July 5, 1966. On this latter date, the Assistant Public Defender presented

his written motion for a continuance, alleging that he was not prepared to go to trial because he had been engaged in two other jury trials since he had been assigned to the case in late May, and he had been unable to interview any of the thirty-six witnesses for the State who might testify. When the trial court denied the motion for a continuance, the Assistant Public Defender moved to withdraw. This motion was also denied and the case proceeded to trial. The defendant, Holice Black, urges that it was a denial of due process of law to force him to trial with unprepared counsel and to refuse a continuance.

We hold that the trial court did not abuse its discretion in denying this motion for a further continuance. We note that although the Assistant Public Defender who represented Holice Black at trial had been assigned to the case only after Public Defender's Office had been reassigned to the case in May, 1966, the record reveals that the Public Defender's Office had been involved in this case for four months; that it had received an investigation file, about four months before trial, from other appointed counsel; and that the Public Defender's Office had been instructed in May that no further continuances would be granted An Assistant Public Defender, other than the one who represented Holice Black at the trial, had represented him for two months before the case went to trial and had received the investigative file mentioned previously.

Further, the first two weeks of the trial were spent in presenting various defense motions and in selecting a jury. During this period as well as during the months which passed in the pre-trial stage, the Public Defender's Office had ample time to interview the witnesses for the prosecution. Six months had elapsed from the date the case had been assigned to the trial judge to the date that this motion for a continuance was presented to him. The motion was not presented until the trial date had arrived. The trial court was justified, under these circumstances, in believing that this motion was presented as an effort to delay the proceedings after the Office of the Public Defender had received adequate time for trial preparation.

■■ The record clearly reveals that Holice Black was reluctant to cooperate with appointed counsel, and this apparently was the reason for the many substitutions of attorneys between arraignment and the time of trial. On one occasion, the court appointed counsel for Holice Black whom Black himself had requested. This counsel withdrew in less than two months because of Black's lack of cooperation. We recognize the gravity of this case in which the prosecution was seeking the death penalty, but the record shows that the trial court did not abuse its discretion in denying the motion for a further continuance. *People v. Van*

*Norman* (1936), 364 Ill. 28, 2 N.E.2d 891; *People v. Latimer* (1966), 35 Ill.2d 178, 220 N.E.2d 314; and *People v. Bond* (1968), 99 Ill.App.2d 45, 241 N.E.2d 218.

Both defendants urge that the trial court committed reversible error by failing to grant them an evidentiary hearing as to whether any of the evidence presented by the prosecution was the fruit of a poisonous tree. On the day this case was assigned to go to trial, Holice Black presented his written motion to suppress photographs, clothing, and other attire seized by the police from his home, allegedly in violation of his constitutional rights. The prosecutor orally informed the court that, without conceding any constitutional violation, the State did not intend to introduce any of these items into evidence. Counsel for Holice Black urged that this was not satisfactory because the evidence which the prosecution now said it was not going to introduce could have been used to lead the State to other evidence which it would present at the trial. Without a hearing, the defense could not detect the source of this evidence. Defense counsel, in effect, argued the fruit of the poisonous tree doctrine and asked for an evidentiary hearing on the motion so that the sources of much of the evidence could be ascertained. The trial court denied the motion, and the defendants urge that this was reversible error.

Because we believe that no reversible error occurred here, we need not determine whether Richard Black can raise this point on appeal when he did not join in the written motion to suppress presented to the trial court by Holice Black. In the cases chiefly relied upon by the defense, (*Wong Sun v. United States* (1963), 371 U.S. 471, *People v. Martin* (1943), 382 Ill. 192, 46 N.E.2d 997 and *People v. Albea* (1954), 2 Ill.2d 317, 118 N.E.2d 277, the reviewing courts independently evaluated the proof to determine whether there was any evidence, independent of that which was inadmissible as being the fruit of the poisonous tree, which would support the conviction. The reviewing courts reversed the convictions only after determining that there was no such independent evidence. In the other case relied upon by the defense, (*Silverthorne Lumber Co. v. United States* (1920), 251 U.S. 385), the only evidence presented by the government was inadmissible as the fruit of the poisonous tree and hence the judgment was reversed.

■■ Although it might have been appropriate for the trial court in the case at bar to have granted an evidentiary hearing on the motion to suppress, we believe that the eyewitness testimony presented by the State, corroborated by the flight of the defendants from Illinois to another state immediately after the crimes had occurred—which evidence is independent of and unrelated to any possible taint under the

fruit of the poisonous tree doctrine—so overwhelmingly supports the convictions that no reversible error occurred. (See *People v. Keller* (1970), 128 Ill.App.2d 401.) As was noted previously, the defendants do not attack the sufficiency of the evidence in this appeal. The prosecution's case was based upon eyewitness testimony and circumstantial evidence including the aforementioned flight of the defendants. Both defendants remained at large for more than four months.

The undisputed facts in the case at bar show that an armed robbery occurred in a Treasure Island store on August 4, 1965, and that Sergeant Eichorst was killed as he attempted to thwart an escape by the offenders. One store employee testified that Richard Black had been in the store about one half hour before the armed robbery was committed and purchased some cigarettes. Another witness, the cashier at the store, identified Holice Black as the person who put a gun in her face in the cashier's cage, announced a holdup, and went through the safe removing the money and placing it in a brown bag. At all times he was but a short distance from her, wore no mask, and she could see him plainly. While the armed robbery was in progress, she was able to depress an alarm signal which could only be heard outside the store.

Thereafter she heard a shrill whistle coming from the front of the store which caused Holice Black to stop what he was doing and leave the store with the money. She then heard three shots and found Sergeant Eichorst lying dead in the parking lot adjacent to the store. A third witness, a man who was walking by the store at the time the armed robbery was in progress, made in-court identifications of Richard Black as the apparent lookout at the front of the store who was placed under arrest by Sergeant Eichorst in the parking lot when he sought to escape, and Holice Black as the man who later came out of the store with a gun and a bag, saw that the police officer had someone under arrest, and shot the police officer. It was stipulated that the cause of death was a bullet which lodged in the brain of Sergeant Eichorst.

■■ Within hours after the offense had occurred, both the cashier and the male pedestrian independently selected the picture of Holice Black from books of photographs shown to them by the police. Their identifications at trial were not doubtful. Where the *corpus delicti* is established in a murder case as it was here, positive identification by even one eyewitness will suffice on the question of identity. (*People v. Rhodes* (1969), 41 Ill.2d 494, 498, 244 N.E.2d 145, 147; *People v. Schanda* (1933), 352 Ill. 36, 185 N.E. 183.) In the instant case two eyewitnesses identified the defendants as being responsible for the murder and the armed robbery. Such testimony is completely unrelated to the exclusionary rule implicit in the fruit of the poisonous tree doctrine. The identifications

occurred prior to the removal of the articles from the home of Holice Black. Furthermore, the identification testimony was corroborated by evidence of the flight of both defendants from Chicago on the day of the crimes.

Neither Holice Black, age 21 at the time of the offenses, nor Richard Black, age 20, elected to testify at their trial. Both sought only to weaken the State's case by showing that the identification witnesses were the victims of mistaken identity. Richard Black presented one witness, his common-law wife, in an attempt to prove an alibi. She was impeached on cross-examination, however, by proof of her prior, inconsistent statements given to the prosecutor in the presence of a court reporter. The jury, after receiving a thorough, fair and impartial instruction on the identification issue and after being told that the State must also prove this element beyond a reasonable doubt, returned its verdicts convicting both defendants of both offenses. Within the facts of this case, we hold that any error which occurred by refusing to hold an evidentiary hearing on the motion to suppress was harmless error beyond a reasonable doubt. *Chapman v. State of California* (1967), 386 U.S. 18, 24.

Richard Black also contends that reversible error occurred when the trial court, after hearing evidence, denied his motion to suppress his handwritten, *pro se* "Petition for Writ of *Habeas Corpus Ad Testificandum Et. Ad Supersedeas.*" This petition was presented to the court and denied approximately four months before the trial. In his petition, Richard Black, although represented by the Public Defender, alleged that he was proceeding *pro se* in regard to this petition and stated therein that the prosecution was about to make knowing use of perjured testimony to gain his conviction and that at the time these crimes were committed, he had already left the presence of his common-law wife and was with his brother, Holice, in a pool hall on the west side of Chicago. The petition concluded with a prayer that the trial court suppress all of the evidence incriminating him and release him from custody. As we stated earlier, the court denied this petition.

At time of trial, Richard Black's privately retained counsel presented a written motion to suppress this petition, alleging: (1) that it was prepared by his client without advice of counsel and was based upon certain suggestions made by inmates at the County Jail; (2) that his client was twenty years of age, had no legal training, and was unaware that the statements contained in his sworn petition could be used to impeach him at trial if he chose to testify; and (3) that use of this petition to impeach him would violate his right to counsel guaranteed to him by the 6th and 14th Amendments of the United States Constitution. The trial court held a hearing on these matters at which two witnesses

testified: (1) Richard Black and (2) the Assistant Public Defender who was representing him at the time he presented his *pro se* petition. The scope of the inquiry was limited to whether or not Richard Black voluntarily elected to proceed *pro se* with regard to his petition. The Assistant Public Defender and the defendant himself admitted that the accused had been advised by the Public Defender, after the latter had looked at the document, not to file the petition at this time but he nevertheless filed the document and argued his position in spite of this advice and although the Assistant Public Defender was with him in open court at the time. At the conclusion of all the testimony, the trial court denied the motion to suppress.

Richard Black now urges that this denial resulted in reversible error. He contends that in his *pro se* petition he raised a 14th Amendment due process point, i.e., knowing use of perjured testimony by the prosecution, and the effect of the trial court' refusal to suppress his petition was to cause him to relinquish one constitutional right [the right to raise the due process point in his petition] in order to exert another constitutional right [the right to remain silent]. Stated differently, the defendant is urging that as a result of the trial court's action in denying his motion to suppress, he was faced with a Hobson's choice: either he must waive his 5th Amendment privilege to remain silent at trial or stand on his 5th Amendment privilege and remain silent but waive the right to present his due process point in the petition. He contends that it is constitutionally impermissible to be compelled to waive one constitutional right in order to exert another constitutional right and cites *Simmons v. United States* (1968), 390 U.S. 377, and *People v. Luna* (1967), 37 Ill.2d 299, 226 N.E.2d 586, in support of his theory.

■■ We note, however, that this contention was not presented in any way to the trial court in the defendant's written motion to suppress his petition or in his later written post-trial motion for a new trial. The sole and narrow issue presented to the trial court in the defendant's own motion to suppress his *pro se* petition, and therefore, the only issue sought to be resolved in the evidentiary hearing was whether Richard Black presented his *pro se* petition without the advice of counsel or whether it was done as his voluntary act and against the advice of his appointed counsel. The constitutionally impermissible dilemma which counsel now urges is, in effect, raised for the first time on appeal. Constitutional claims, like other claims, may be waived, and the absence of any prior objection in the trial court prohibits consideration of this point. *People v. Hanna* (1969), 42 Ill.2d 323, 247 N.E.2d 610; *People v. Hubbard* (1967), 38 Ill.2d 104, 230 N.E.2d 220.

Furthermore, it is to be noted that Richard Black's *pro se* petition

contained both a due process allegation, which alleged knowing use of unspecified perjured testimony by the prosecution, and an exculpatory evidentiary allegation, namely, that at the time these offenses had occurred he had left the premises of Alicestine Suddoth, his common-law wife, and was with his brother, Holice, in a west side pool hall. At the trial, his common-law wife testified in his behalf and stated that Richard Black was with her when the offenses occurred. Apparently, if it were not for the inconsistent statement he made earlier in his *pro se* petition, which statement provided a potential source of impeachment for the prosecution in the event Richard Black testified, he might have taken the witness stand and attempted to corroborate the woman's testimony in further support of his alibi defense. From a trial tactic point of view, counsel for Richard Black was concerned only with the damaging exculpatory admission made by his client in the earlier *pro se* petition and not with the due process allegation. Indeed, the due process allegation was not relied upon in the written motion to suppress the petition, nor was it mentioned in the later evidentiary hearing. On appeal, however, appellate counsel for Richard Black (who did not represent him at trial) has stressed only the due process allegation in support of his constitutional impermissible dilemma contention. The trial court in this case, unlike the trial courts in *Simmons* and *Luna*, was not called upon to rule on this specific issue for the apparent reason that trial counsel did not base his motion to suppress on the due process allegation. The issue is raised for the first time on appeal, and we consider the point to have been waived.

Both defendants also contend that the pre-trial identification methods employed by the police and the prosecution were unnecessarily suggestive, conducive to mistaken identity, and violated due process of law. However, they do not attack the damaging identification testimony of the male pedestrian who identified Holice Black as the slayer of Sergeant Eichorst and Richard Black as the man Eichorst had under arrest at the time he was killed. Although it is urged on appeal that the in-court identifications by the two women store employees were the products of suggestive methods employed by the police and the prosecutor, the identification by the male pedestrian is not attacked in any manner. It is not suggested that his in-court identification of both defendants was in any way tainted by suggestive pre-trial identification procedures. As we stated earlier, where the corpus delicti is established in a murder case, positive identification by even one eyewitness will suffice on the question of identity. (*People v. Rhodes* (1969), 41 Ill.2d 494, 498, 244 N.E.2d 145, 147; *People v. Schanda* (1933), 352 Ill. 36, 185 N.E. 183.) Thus, we find no merit in this contention.

■■ Finally, the defendants urge that they were denied a fair trial by the prosecutor's accusation, in the presence of the jury, that defense counsel had lied and by the State's later attempt to elicit incompetent hearsay evidence in violation of the orders of the trial court. The record reveals that these were two isolated events in a long trial and that the trial court immediately informed the jury to disregard the remarks of the prosecutor regarding the lying incident. As for the hearsay matter, the trial court sustained the objection of defense counsel and the witness was not allowed to give such testimony. A later instruction reminded the jury to disregard such matters in arriving at their verdict. In our opinion, the actions of the trial court resulted in keeping this record free from reversible error. *People v. Murray* (1923), 307 Ill. 343, 138 N.E. 681; *People v. Lion* (1957), 10 Ill.2d 208, 216, 139 N.E.2d 757.

The defendants have also filed a supplemental brief *pro se* in which they assert: (1) that they were denied equal protection of the laws in that Negroes were systematically excluded from the jury; (2) that a statement made by the prosecutor during the course of final argument was highly prejudicial and calculated to obtain a conviction on the basis of race; and (3) that they were denied a fair trial in that the trial court vouched for the credibility of a prosecution witness.

■■ As previously noted, the selection of the jury required a period of eleven court days and covers in excess of twenty-three hundred pages of the report of proceedings. Our review of this exhaustive record fails to reveal any factual basis for defendant's equal protection argument. No challenge to the array was made nor does the record indicate that racial considerations played a part in the excusing of any venireman.

■■ The statement of the prosecutor which defendants assert was calculated to procure a conviction based upon racial passions was a reference to the deceased immediately after the shooting occurred as "* * * a white faced man lying in a pool of blood." While we believe the statement was intended to portray the condition rather than describe the race of the victim, this court cannot ignore the racial identification inherent in the statement. We believe, however, that the trial court's prompt action in sustaining an objection to the characterization and direction to the jury to disregard it was sufficient to cure any possible harm which might have otherwise arisen.

■■ Similarly, we find the final contention raised in the supplemental brief to be without merit. During the course of one of defense counsel's examination of a prosecution witness, the prosecutor injected a remark concerning a question asked. Defense counsel then suggested to the trial court that he could not be certain that the witness' testimony would not be influenced by the remark, to which the court responded, "This witness

is sworn to tell the truth and she will tell the truth." We believe the nature of this statement to be such that the meaning conveyed is dependent upon the manner of its delivery, a fact which is not ascertainable from the printed pages of the record. Nevertheless, even were all inferences surrounding the fact that the statement was made resolved in favor of defendants, we do not find that they were substantially prejudiced in the light of the court's immediate admonition to the jury:

"The jury will disregard any remarks of counsel, counsel's job is to make objections and not remarks.

The jury will disregard any remarks I have made, I do not intend to indicate, as I told you when we started this proceeding, by anything I say or do, I do not indicate any judgment on the facts in this case, that is your sole province, or the credibility of any witness, that is the province of the jury, if I made any remarks that might be misinterpreted I do not mean that it should be misinterpreted."

The judgments are affirmed.

Judgments affirmed.

McCORMICK, P. J., and BURKE, J., concur.