(No. 36612.—

THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, *vs.* CHARLES MELQUIST, Plaintiff in Error.

*Opinion filed Sept. 28, 1962.—Rehearing denied Nov. 29, 1962.*

BELLOWS, BELLOWS & MAGIDSON, of Chicago, for plaintiff in error.

WILLIAM G. CLARK, Attorney General, of Springfield, and WILLIAM J. BAUER, State's Attorney, of Wheaton, (FRED G. LEACH and E. MICHAEL O'BRIEN, Assistant Attorneys General, and WILLIAM V. HOPF and JAMES E. FITZGERALD, Assistant State's Attorneys, of counsel,) for the People.

, · Mr. JUSTICE KLINGBIEL delivered the opinion of the court:

The defendant, Charles Melquist, was tried by jury in the circuit court of Du Page County and convicted of the crime of murder. The jury set the penalty at 99 years in the penitentiary. We have issued a writ of error to review the judgment of conviction.

The defendant, who was 21 years of age, was charged with killing one Bonnie Scott. The evidence showed that Bonnie, a 15-year-old girl, left her home on September 22, 1958 at approximately 7 P.M. She was never seen alive after that time but on November 15 her body was discovered in a wooded area about 30 feet away from a highway. The

body was badly decomposed and the head had been severed from the body and was found some distance away from the body. There were two deep wounds on the body extending from the chest to the abdomen. Bonnie's watch was found about 30 feet away from her body. Due to the condition of the body the pathologist who conducted the autopsy was unable to determine the cause of death. However, he was of the opinion that the head had been severed after death and also that the cuts on the body had been inflicted after death.

On November 16 at about 11:30 P.M., the defendant went to the police station in Addison, Illinois, at the request of the authorities. He was questioned from about 12:15 to 1:00 in the morning and after about an hour, during which the officers were questioning other persons, the questioning of the defendant was resumed at about 2:00 A.M. and continued until about 3:00 A.M. During both of these periods the defendant denied any knowledge of either the disappearance or death of Bonnie Scott. At about 3:00 A.M. the defendant was released and was driven to his home by the chief of police. The authorities requested that defendant return to the station at 10:00 that morning and at that time he returned to the station with his father. He was questioned for about an hour and after a 15-minute break he was questioned again, and in both of these conversations he denied any knowledge of the death or disappearance of Bonnie. At about 2:00 in the afternoon the officers took the defendant to the office of John Reid, a polygraph expert. They stopped on the way to Reid's office and had a meal and arrived at the office about 4:00 P.M. The defendant was questioned by Reid for about two hours and during this interrogation, the defendant confessed that he had killed Bonnie Scott. His statement was typed by Reid's secretary and, after reading the statement, the defendant signed it. In that statement he said that he and Bonnie were parked in the defendant's car in his driveway on September 22nd

and were "goofing around," tickling each other and wrestling. The defendant said that he grabbed a pillow and held it over Bonnie's face. He said he must have held it there too long because the next thing he knew she wasn't moving any more. When he realized she was dead he drove out Mannheim Road to about 95th Street and dumped her body out of the car, after taking off her clothes. He kept the clothes in his car and two days later he burned the clothes someplace in the vicinity of his home. He said that he went back about 4 weeks later to bury the body and found that the body was badly deteriorated and the head had been almost severed from the body as if the flesh had been eaten away. He cut the head off the body and then had an urge to cut some more and made about an 8 or 12 inch cut in the body.

After signing the statement at Reid's office, the defendant and the officers left the office at about 9:00 P.M. and went to the office of Frank Ferlic, the first assistant State's Attorney for Cook County, where another statement was taken from the defendant but was not signed at that time. This statement was practically the same as the first statement insofar as the death of the deceased and the subsequent events were concerned, except that defendant also stated that Bonnie had been wearing a watch and a necklace. He said that he had thrown the watch about 30 feet from where he had dumped the body and had thrown the necklace out of the car on the way home. In this statement, defendant went into considerable detail concerning his prior relationship with Bonnie.

At about 11:00 P.M. the defendant was taken to the Bedford Park sheriff's station where he was interrogated by several newspaper reporters. He informed the reporters that he was tired but told them he had been treated "swell." He was held in custody at the Bedford Park station overnight and about 10:00 the following morning he was taken to Villa Park where he was served with a murder warrant.

He was then taken to his home where he located two small pillows. He was asked which one of these pillows he had used to smother the deceased and he replied that he could not tell, because they were identical, but that one of those pillows was the one he had used. The defendant was then taken to the scene where Bonnie's body had been discovered where he pointed out a spot on the ground and told the officers that that was the place where he had left Bonnie Scott. The spot indicated was the exact place where the body had been found. The defendant told the officers that he had thrown his knife out of his car and he attempted to show them where he had disposed of the knife. He also attempted to point out the place where he had burned Bonnie's clothing but the officers were unable to find the knife or the burned clothing. Following this trip the defendant was returned to Villa Park where he signed the confession he had made in Ferlic's office.

The defendant contends that his confessions should not have been admitted in evidence. It is not contended that the confessions were induced by force or by promises of leniency. The argument here is that the confessions were obtained after extensive questioning which tired the defendant to such an extent that his power to resist was weakened. In our opinion the record does not sustain the defendant's contention. He was questioned for only about 2 hours on his first visit to the police station and was permitted to return home. When he returned with his father later that morning, he was questioned only for about 2 hours in the police station before being taken to Reid's office. The questioning in Reid's office commenced about 2½ hours later and lasted a little over 2 hours. Thus it appears that the defendant had been questioned only for about 6 hours altogether, and that substantial intervals of time elapsed between the 3 occasions when defendant was questioned. His second confession in Ferlic's office was made shortly after the Reid confession and there is no evidence of any lengthy

interrogation leading to this confession. After he left Ferlic's office, the defendant told the reporters he had been treated "swell" although he complained of being tired. The defendant did not testify at the hearing on the motion to suppress his confessions and there was no testimony at that hearing which in any way tends to prove that the defendant confessed because he was so worn out that he had lost his power to resist. Defendant also urges that he was being held illegally and that this illegal detention renders the confessions inadmissible. In support of this argument the defendant contends that the authorities of Du Page County illegally retained custody of the defendant notwithstanding the fact that the criminal court of Cook County had issued a writ of *habeas corpus* commanding the production of the defendant before that court. The only testimony at the hearing on the motion to suppress the confessions relating to this issue was the testimony of John Roche, a captain on the Cook County sheriff's police. He testified on cross-examination that the first time he had any information concerning a writ of *habeas corpus* was after the defendant had been returned from the Bedford Park station to Villa Park on November 18. Although he was informed by someone that a writ had been issued, no writ was ever served on him or anyone else. He then turned the defendant over to Du Page County officials. If a writ of *habeas corpus* had in fact been issued, it was issued after the defendant had made and signed the confession in Reid's office and after he made his confession in Ferlic's office, although he signed the latter confession sometime after the writ had allegedly been issued. The re-enactment at the scene where the body had been discovered also took place thereafter. We are of the opinion that the confessions were not rendered inadmissible by reason of the fact that Roche turned the defendant over to the Du Page County officials after being informed that a writ had been issued. There was no direct testimony at the hearing to prove that a writ had actually been issued. Even if

we were to assume that a writ had been issued and to further assume that Roche should have honored the writ simply because he was informed of its issuance, it is clear that the Reid and Ferlic confessions are in no way affected, since they were made prior to the alleged issuance of the writ.

The defendant's contention that the signed Ferlic confession and the re-enactment were inadmissible is based largely upon the opinions of the United States Supreme Court in *McNabb* v. *United States*, 318 U.S. 332 and *Mallory* v. *United States*, 354 U.S. 449. As we have pointed out, these cases deal with problems of Federal criminal procedure and do not require a holding that confessions in State court prosecutions be held invalid merely because they are obtained during a period of illegal detention. (*People* v. *Miller*, 13 Ill.2d 84.) We are of the opinion that the evidence at the hearing clearly established that defendant's confessions were voluntary and they were therefore properly admitted in evidence.

The defendant also contends that even if the confessions were admissible, the prosecution failed to establish the *corpus delicti* by any evidence outside of the confessions. The *corpus delicti* of the crime of murder consists of two essential elements: the fact of death, and the fact that the death was produced by the criminal agency of some person. The defendant argues that the State completely failed to prove that the death of Bonnie Scott was the result of a criminal act. This contention is based upon the fact that it was impossible to establish the cause of death because of the decomposed condition of the body. The rule applicable in cases such as this is that a voluntary confession is insufficient to support a conviction without corroborating evidence. However, it is not necessary that the *corpus delicti* be established by evidence completely independent of that which tends to connect the accused with the crime. If there is corroborating evidence which tends to confirm the cir-

cumstances related in the confession, both may be considered in determining whether the *corpus delicti* is sufficiently proved. (*People* v. *O'Neil,* 18 Ill.2d 461.) In the defendant's confession he admitted killing the deceased. He stated in his confession that he had thrown the deceased's watch about 30 feet away from the place where he had put the body and the watch was found about that distance from the body. The defendant was also able to point out the exact spot where the body had been found and identified a pillow from his home as the one he had used to smother the deceased. These circumstances are similar to those in the *O'Neil* case which involved a prosecution for arson, in which the defendant pointed out to the police the exact spot where the fire had started and re-enacted the crime. We there held that these corroborating circumstances, together with defendant's confession, were sufficient to establish a *corpus delicti.* We are of the opinion that there was sufficient corroborating evidence in the present case outside of the defendant's confession to establish the *corpus delicti.*

The defendant further contends that he was deprived of his right to a fair and impartial trial and deprived of due process of law. In support of this contention it is alleged that the fact that defendant had been subjected to a lie-detector test was improperly brought out before the jury. John Reid's secretary testified that the first time she saw the defendant was when he was brought into the "laboratory". The defendant argues that the use of the term "laboratory" must have conveyed the impression to the jury that the defendant had been subjected to a lie-detector test. In our opinion, the term "laboratory" would not necessarily convey to the jury the fact that the defendant had taken a lie-detector test, and we find little merit in defendant's contention. The record also shows that a newspaper reporter testified for the State as to a conversation he and other reporters had with the defendant at the Bedfore Park station. After testifying as to certain statements made by the de-

fendant, the prosecutor asked him whether he recalled any other questions which were asked the defendant and any other answers which he gave, and the reporter replied that the defendant was asked, "If you were guilty, why did you take a lie test?" Defendant's counsel objected and moved for a mistrial, and after a recess, during which the question was argued by counsel, the court denied the motion. There is nothing in the record to suggest that the prosecutor deliberately elicited this reply or that he had any knowledge that the witness would so testify. We are of the opinion that the reply of the witness was not a sufficient ground for declaring a mistrial, even though it conveyed to the jury the impression that the defendant had taken a lie-detector test. Cf. *People* v. *Flowers*, 14 Ill.2d 406.

The defendant argues that the trial court should have deleted portions of the defendant's confessions before permitting them to be admitted in evidence. In the confession which the defendant made at Ferlic's office, the defendant stated that he had first met Bonnie in June, 1957, more than a year before her death. A short time after he met her he took her to a forest preserve, and while they were parked there he kissed her and fondled her. About a week later he again took her to the forest preserve where the same acts were repeated. According to the statement, the defendant attempted at this time to have intercourse with Bonnie but she refused. The defendant contends that these acts constituted the criminal offense of taking indecent liberties with a minor and it is urged that since this offense was unrelated to the offense for which he was on trial that all references to these acts should have been deleted from the statement before it was submitted to the jury. While it is true that proof of unrelated criminal offenses is normally improper and any reference to such offenses should be deleted from a statement, there are well defined exceptions to this rule. Evidence of other crimes is admissible to prove design or motive where these matters are in issue or relevant. (*People*

v. *Davis,* 413 Ill. 391.) In our opinion the fact that the defendant had attempted to have intercourse with the deceased tends to establish a motive for the crime and casts doubt upon his statement in his confession that he smothered the girl accidentally while tickling her. We therefore are of the opinion that the trial court correctly ruled that these portions of the confessions need not be deleted.

The defendant also contends that he was deprived of a fair and impartial trial by reason of a remark made by a spectator. During the direct examination of the defendant he was asked whether one of the reporters had asked him, "Charlie, did you do it?" and whether he had replied, "I did it." The defendant answered "I did not." The record then shows that a spectator said "He's a damn liar." In the defendant's motion for a new trial he contended that this remark in the presence of the jury was so prejudicial as to require a new trial. It was brought out at the hearing on the motion for a new trial that neither counsel for the defendant, nor the court, nor the prosecutor heard that remark, although it was heard by the court reporter. The court stated that during the entire trial of the case, which took a considerable period of time, there were no outbursts or demonstrations of any kind other than this one remark. The court stated that he had not heard the remark but that the court reporter had told him during a recess that he had heard it and the court advised him that it was a part of the official record and should be included in the record. The court stated that he was unable to say whether the remark was heard by the jurors or whether, if it had been heard, it could have affected their judgment. In view of the fact that it appears doubtful that this remark was even heard by any of the jurors, we do not believe that it is necessary for us to even speculate as to the possible prejudicial effect of that remark, and we are of the opinion that the trial court correctly denied the motion for a new trial on that ground.

The defendant contends that even if his confession was

32

properly admitted in evidence, the most it shows is that the killing was either accidental or manslaughter. We have heretofore held that where the only testimony of the actual facts of a homicide is by the defendant, the jury is not compelled to accept his statements, but may consider the surrounding circumstances, and also the probabilty or improbability of his narration. (*People* v. *Uher*, 375 Ill. 499.) The statement by the defendant that he and the deceased were playfully tickling each other and having a pillow fight and that he smothered the deceased in the course of this activity could well have been considered by the jury as highly improbable. The jury could have believed that the defendant killed the deceased deliberately and were not bound to accept his version of the deceased's death.

After a careful consideration of all assignments of error, we are satisfied that the defendant received a fair trial, free from prejudicial error. The judgment of the circuit court of Du Page County is therefore affirmed.

*Judgment affirmed.*