THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* JOHN S. PARISIE, Defendant-Appellant.

(No. 11162;

Fourth District—June 26, 1972.

1014

CRAVEN, J., specially concurring.

E. Roger Horsky, of Defender Project, of Elgin, (Thomas Holum, of counsel,) for appellant.

Richard A. Hollis, State's Attorney, of Springfield, for the People.

Mr. JUSTICE RICHARD MILLS delivered the opinion of the court:

"The tragedy of man is that he can conceive perfection but he cannot achieve it. Man's reach is always beyond his grasp."
—Reinhold Niebuhr

The *perfect* trial has yet to be tried. And we venture to suggest that it never will be. For any creation of man is merely a reflection of himself— imperfection. Consequently, there is no such thing as a *perfect* trial. All we can reasonably and logically strive for is a *fair* trial—the "cutting edge" to our system of criminal justice.

The jury trial in this case admittedly was not perfect, but it was fair. Every constitutional right and safeguard was afforded the defendant as is reflected by the 2,706 pages of the record before us. A brace of very able and ingenious court-appointed trial defense counsel obviously labored long in an exhausting effort to (1) win before the trial judge, (2) get a

favorable verdict from the jury or (3) preserve sufficient error to satisfy a reviewing court that a reversal must occur. However, and in short, we hold that the trial judge did not commit reversible error in his procedural rulings, that the jury trial was fair and its verdict proper and that whatever error exists in this record is insufficient to dictate reversal. In balance, justice was done.

Briefly, the facts in this murder prosecution are as follows: At about 10:45 on an April evening, a tow truck driver on his way to see a customer found a man alongside a lonely country road outside the City of Springfield. The man said that he had been shot and asked to be taken to a hospital. The tow truck driver reported to his base station immediately on his radio, and the State Police came to the scene at about 11:15 P.M. The State Trooper Boone found the tow truck sitting in the middle of the road and the man lying alongside of the road. He recognized the man as a local automobile dealer and observed that his shirt front was covered with blood. Trooper Boone asked the man who shot him and he said he didn't know. The Trooper also asked where his car was and he said he didn't know. The wounded man was taken to the hospital and at approximately 1:30 A.M. the following morning Trooper Boone had another conversation with the man. In the emergency room the wounded man told him again that he did not know who shot him, that he had met this fellow at 5th and Jefferson Streets in Springfield, that they went for a ride around the lake and that they had not parked. Another trooper, Dragoo, was present at the first conversation and testified to a conversation with the wounded man substantially similar to the one related by Trooper Boone. Following emergency surgery, the wounded man died at approximately 10:30 A.M. that morning.

A deputy sheriff testified that the defendant was found asleep in the decedent's car at 5:22 A.M. the same morning and that there was blood on the left front seat, left door and left rear fender of the car. When he was apprehended, the defendant had the decedent's driver's license and credit cards in his own wallet, and he had the victim's cigarette lighter and wallet (containing checks and papers of the decedent) in his pocket. The decedent's sport jacket was found folded on the back seat of the car and in the pocket was decedent's gold wedding ring. The defendant was placed under arrest and remained in the county jail until trial. At the jury trial, Parisie testified on his own behalf and admitted that he shot deceased. He also admitted that he had stolen the pistol used to kill the decedent during a burglary a few days earlier and that he had fired the pistol in his hotel room before the shooting of the decedent. Parisie was found guilty by the jury and was sentenced by the court to a penitentiary term of 40 to 70 years.

The defense was that of insanity—insanity based upon "homosexual panic." The single constant thread woven throughout the fabric of this appeal is the issue of homosexuality and the theory of defendant attempting to equate "homosexual panic" with insanity. And since this theory underlies some of the specific issues raised, we will consider it at the outset.

The defendant on the stand testified that he had met the deceased sometime before the date of the incident when he was in the automobile dealership looking for a used sports car. He testified that on the night in question he was walking on 5th Street in Springfield when decedent's car pulled up next to him and the decedent offered him a lift. He said that the decedent drove out of Springfield, past the lake, turned down a gravel road and parked. Defendant further testified that after turning off the lights and sliding back the seat, decedent made a homosexual advance, smiled and said if the defendant refused he would have to walk. Parisie testified that he just "blew up, went crazy," vaguely remembered struggling with the decedent and hearing a noise that he assumed to be gunshots. The next thing he remembered clearly was being in the deceased's car in a Springfield parking lot and he did not remember how he got there.

Defense, both at the trial stage and in this court, has devoted much of its energies to impute that the prosecution failed to prove defendant's sanity beyond a reasonable doubt. In this regard, the Illinois law reads thusly:

"§ 6-2. Insanity

(a) A person is not criminally responsible for conduct if at the time of such conduct, as a result of mental disease or mental defect, he lacks substantial capacity either to appreciate the criminality of his conduct or to conform his conduct to the requirements of law.

(b) The term 'mental disease or mental defect' do not include an abnormality manifested only by repeated criminal or otherwise anti-social conduct."

Illinois Revised Statutes, 1967, Chapter 38.

With this legislative overleaf, we now look at the extensive and voluminous testimony and evidence given by both the prosecution and the defense in this area. (The court notes at this point that the trial judge permitted very liberal and extensive testimony by the professional and expert witnesses in this area.) Defendant called a clinical psychologist who testified that Parisie was a highly delusional paranoid schizophrenic, who was a loner, with a basic distrust of people, a highly latent homosexual with strong feelings of inferiority, and that a severe stress situation of any type could result in an acute schizophrenic reaction

with accompanying amnesia. Defendant then called a psychiatrist who testified that "homosexual panic" is a severe panic or fear reaction that is provoked by extreme anxiety or psychological trauma, and this often takes the form of a state of amnesia, in which the person sets aside or forgets unconsciously something that his conscious mind cannot tolerate. He was then given a hypothetical question, covering the entire background and history of the defendant and the basic facts surrounding the defendant's theory of the case on trial. The psychiatrist answered the hypothetical question by testifying that it was *possible* that this hypothetical individual suffered an acute homosexual excitatory state at the time he shot the victim. The psychiatrist then testified that it was *possible* that a person suffering from this type of reaction—an acute "homosexual panic"—would be acting purely instinctively and conceivably without ability of self-control. Furthermore, on direct, the psychiatrist allowed that "homosexual panic" is not *per se* an illness, but is a symptom. On cross examination, he stated that "homosexual panic" is not recognized as a mental illness, nor is it included in psychiatric nomenclature, that it is not a mental defect recognized by psychiatric nomenclature and is merely a symptom of a psychiatric disturbance. At the culmination of his testimony defendant's psychiatrist stated that the person in the hypothetical, who was suffering from a state of acute "homosexual panic," was at the time of the act in question unable to conform, and unable to control the given impulse, but that this would be by reason of the *possibility* that he might have been undergoing a "homosexual panic" and would not be by reason of his suffering from a mental disease. He was unable to render an opinion whether Parisie suffered a mental disease or defect which caused him to lack substantial capacity to appreciate the criminality of his conduct.

In rebuttal, the prosecution called a psychiatrist who testified that Parisie was a psychopath and not suffering from schizophrenia or insipient schizophrenia. He further testified that an acute homosexual panic is not a mental defect or mental disease, but is a personal disturbance. He was of the opinion that this was not a homosexual panic since defendant was not a homosexual. He answered the hypothetical question by saying that the person described therein had sufficient capacity to comprehend the nature and consequences of his acts and that he was not insane and not suffering from any form of mental disease or mental defect. He also stated that "homosexual panic" is not recognized as either a mental disease or defect—it is a personality disturbance.

■■ The burden, of course, is upon the State to prove the capacity of the defendant to commit the offense charged. And the presumption in favor of sanity and mental capacity is always present until the defen-

dant has presented sufficient evidence to overcome that presumption. There can be no question that defendant suffered from personality disorders, and even perhaps from all of the psychological and psychiatric debilities testified to by his expert witnesses. But none of it equated his mental suffering to either a "mental disease or mental defect," or indicated that his "capacity either to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law" was impaired by such, and the jury so found. The extensive and elongated testimony of psychological and psychiatric problems, as well as the results of psychological tests and personal history background, were all before the jury, by virtue of the correct and liberal permission by the court. It was a jury question. On the state of the evidence above recited we cannot at all say that it was sufficient to establish a mental disease or defect within the meaning of the statutory definition nor to create a reasonable doubt as to the sanity of the defendant. The jury's finding that the defendant here was sane cannot be construed as against the manifest weight of the evidence. *People v. Gold,* 38 Ill.2d 510, 232 N.E.2d 702, 707.

We will now address ourselves to the specific issues raised on appeal in the same order as presented.

First: *Change of venue.* Defendant alleges that he was denied the right to a fair trial when the trial court erroneously refused a change of venue from the county. There was but one affidavit, that of defendant, which was presented in support of his motion. The court actually conducted several hearings upon this motion for venue change, after requesting defense counsel to furnish the court with copies of the alleged prejudicial news coverage. At the first hearing, the defense introduced 40 separate news articles as exhibits, and at the second hearing filed 79 additional exhibits and news releases. The defense called four witnesses from the news media to testify as to the authentication of the exhibits. The vast bulk of the exhibits appear to us to be no more than routine news items and coverage. It would appear from the record and arguments of defense counsel that they are also of that mind since they rely almost exclusively upon one coverage that reported the coroner's jury verdict that decedent died from wounds inflicted by .22 calibre bullets from a gun held by John Parisie, and other news reports that Parisie was involved in a jail break from the local county jail, when in fact such report was false. Parenthetically, we would point out that the content of both of these news items would only go to the question of guilt—and when Parisie later admitted his guilt upon jury trial, such prejudice, if any existed, was meaningless. But even assuming that such reports were prejudicial to the defendant, were they sufficiently of a degree to prevent him from

receiving a fair trial in Sangamon County and should the motion for change have been allowed?

This is no longer the day and age of a half day ride by horseback to the county seat. We do not live in a vacuum, but in a civilized world, and there is no place to hide from the media. Television and radio seek·out that which was heretofore in a bygone age completely inaccessible. It would seem nigh on impossible in this present day to call a venire of prospective jurors that would be free from the "taint" of news coverage in a murder case. Indeed, we would venture to suggest that it is much more desirable to have a venire of people who are aware and cognizant of that which exists in their society than it is to have a panel of jurors with little acquaintanceship with their environment. As was noted in *Irvin v. Dowd,* 366 U.S. 717, 81 S.Ct. 1639, 6 L.Ed.2d 751, 756:

> "It is not required, however, that the jurors be totally ignorant of the facts and issues involved. In these days of swift, widespread and diverse methods of communication, an important case can be expected to arouse the interest of the public in the vicinity, and scarcely any of those best qualified to serve as jurors will not have formed some impression or opinion as to the merits of the case. This is particularly true in criminal cases. To hold that the mere existence of any preconceived notion as to the guilt or innocence of an accused, without more, is sufficient to rebut the presumption of a prospective juror's impartiality would be to establish an impossible standard. It is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court."

■■ The Illinois position is that an accused is entitled to a change of venue when it appears there are reasonable grounds to believe that the prejudice alleged actually exists and that by reason of the prejudice there is a reasonable apprehension that the accused cannot receive a fair and impartial trial. (*People v. Williams,* 40 Ill.2d 522, 240 N.E.2d 645, 650.) The granting of a motion for a change of venue from the county on grounds of prejudice of the inhabitants thereof rests in the sound discretion of the trial court. But this discretion may not be exercised arbitrarily and is subject to review in case it is abused. (*People v. Allen,* 413 Ill. 69, 107 N.E.2d 826, 828.) And it has been repeatedly held in Illinois that *voir dire* examination of prospective jurors is probably the most valuable means of determining bias or partiality among the venire in the typical or usual case where prejudicial pretrial publicity is alleged. *People v. Kurtz,* 37 Ill.2d 103, 224 N.E.2d 817, 820; *People v. Black,* 130 Ill.App.2d 996, 266 N.E.2d 458, 461.

■■ The *voir dire* examination here was quite extensive as reflected

from the 845 pages of the record before us. A total of 69 veniremen were called and examined. Of that number, the court excused 28, the prosecution used 12 peremptory challenges and the defense exercised 19 of its statutory total of 20. Those that were ultimately selected had either read or heard of the case. But under extensive examination by the court, prosecution and defense all of the jurors answered that they would indulge in the defendant's presumption of innocence throughout the trial, were open-minded, knew of no reason why they could not give both sides a fair trial, would require the State to meet its burden of proof beyond a reasonable doubt, would be fair and impartial, had no opinion as to the guilt or innocence of the defendant, and were of the same frame of mind that they would want a juror to be if they or their children were on trial. There is no showing whatever in this appeal, from either the briefs or the record, that any of these jurors had any impression, let alone opinion, as to the guilt of Parisie. And there is certainly no foundation to allege that the pretrial publicity prejudiced the jury against the defendant. A motion for change of venue came seven months after the crime, three months after the case had been reassigned (upon motion of defendant) to the trial judge and two months before the case was actually tried. It has been held that a sufficient time lapse between the news accounts and the trial itself may be considered as having dissipated any feeling of prejudice, whether real or imagined. *People v. Berry*, 37 Ill.2d 329, 226 N.E.2d 591, 593.

■■ Predicated upon all of these factors, the record before us cannot substantiate error in the denial of the change of venue. There is utterly no showing that the trial judge acted out of bad motive, upon whim or abuse of his discretion. We believe that the jury finally selected to try Mr. Parisie represented a fair and impartial trier of the facts. The fact that defendant did not exhaust his peremptory challenges would suggest that defense counsel were of like opinion. *People v. Black, supra*, 266 N.E.2d 458, 461.

■■ Second: *Voir dire*. Mr. Parisie next contends that the trial court improperly restricted defense counsel's *voir dire* examination by refusing to inquire on the subject of homosexuality. About two months before the trial a private attorney representing the family of the victim presented a motion *in limine* seeking to enjoin the defendant from making any adverse characterization of decedent as a homosexual without first showing materiality of the issue and its admissibility. Defense counsel conceded that it was necessary to show the materiality and relevancy of homosexuality, and that they "would be delighted" to do so but "out of the presence of the State's Attorney." The trial judge, of course, refused to hear any one-sided arguments from defense without the presence of

the prosecution—and rightly so, since even-handed justice would appear to dictate that we still apply our substantive law by adversary practice. To force a trial judge to conduct an *ex parte* and *in camera* hearing in a criminal prosecution and to make a fair decision with but one biased position before him places an intolerable yoke upon the shoulders of any magistrate. The court then ruled, "Nothing will be said on the subject matter of homosexuality involving the decedent and the defendant and counsel for both parties are instructed not to make any mention of it in public or in trial until admissibility is shown."

■■ During the first day of *voir dire* the court itself asked the following question: "There may be some evidence in this case of homosexuality. If the evidence should show any person whose name comes up during the trial of this case was involved in acts of homosexuality, would that fact alone create prejudice or sympathy for that person?" (Parenthetically, it is noted from the record that no jurors were accepted on the first day of *voir dire*.) At the beginning of the second day of juror selection, the court ruled as follows out of the presence of the jury: "Because of the failure or refusal of defense counsel to explain to the court why they should ask questions regarding homosexuality, the court will not permit any further questions in this area until it is shown that the defendant will be prejudiced." Thereafter, defense counsel made no further argument whatever to justify a *voir dire* excursion into the realm of homosexuality, made no proposal to offer any proof and the matter there dropped. On the third day of *voir dire* the defense presented to the court an affidavit of one of the defendant's lawyers wherein he stated that three persons who were presently incarcerated (one in a Tennessee jail, another in an Illinois penitentiary and a third at the Illinois State Farm), if called to testify, would state that each, respectively, had homosexual relations with the decedent, knew decedent's reputation in the community was that of a homosexual, and that decedent had been observed in a "known homosexual hangout" holding hands with another male person. The affidavit was signed by defense counsel and alleged that it was based upon interviews conducted by an investigator. (The natural question that arises, of course, is why was not the affidavit executed by the prospective witnesses rather than defendant's lawyer?) At the time that this third-hand affidavit was furnished, the defense asked the court for a reconsideration of the matter of posing questions concerning homosexuality to the veniremen. To this the court said, "I don't think it is shown to be material or admissible yet * * *. You have to show the admissibility of the evidence on the subject about which you are going to ask the jury." Defense counsel rejoined, "We feel this is not a requirement." The court again denied the request and

the subject of homosexuality was not mentioned at all during the remainder of the *voir dire*. It is patently apparent that the court properly placed upon the moving party the burden of showing relevancy, materiality and/or admissibility of such evidence. The defense utterly failed to sustain its proper burden and the court to our view ruled correctly under the circumstances and properly limited the *voir dire* on this subject.

For us to hold that defendant was entitled to examine prospective jurors on any subject he felt pertinent without explaining the relevancy to the trial court defies logic and permits unbridled and unlimited safaris into nearly any area of human endeavor, regardless of its utter irrelevancy to the issues being tried. This is not the law in Illinois. The basic rule is as old as our system of justice: The scope and extent of *voir dire* examination rests within the sound discretion of the trial court, and is subject to reasonable limitations imposed by the presiding judge. Were this not so, an eternity would be required in certain cases to obtain an impartial jury of twelve peers. The case of *People v. Lobb*, 17 Ill.2d 287, 161 N.E.2d 325, contains a very excellent discussion of the history and purpose of *voir dire* examination and concludes that "There is nothing in the constitutional guarantee of the right to a trial by jury which prevents reasonable regulation of the manner in which jurors shall be selected." (161 N.E.2d 333) And that reasonable regulation is manifested in Supreme Court Rule 234, pursuant to that court's power to make rules governing the practice in Illinois trial courts.

Defendant further argues the efficacy of error in the restricted *voir dire* on the basis that he learned that one of the members of the jury impaneled had a homosexual relative. This matter was brought to the court's attention immediately after the People rested their case. Defense counsel renewed his earlier motion for mistrial presented during *voir dire*, and said to the court: "Since the time that the jury has been impaneled, I have learned through unimpeachable sources that one of the jurors, in fact has a homosexual relative and * * * our failure to discover this at the time of examining the jurors, we feel has prejudiced us in the trial of this case to such an extent as to require that the court declare a mistrial." The court then asked, "Anything further?" To which defense counsel replied: "That's all." Whereupon the court overruled the motion.

What immediately strikes us is the peculiar timing of the renewal of the motion, being immediately after the People have rested their case. Defense counsel apparently knew of his so-called "unimpeachable sources" for some period of time without bringing it to the attention of anyone. He did not identify his "unimpeachable sources" for his in-

formation, he did not identify the subject juror, he did not request the substitution of one of the alternate jurors, nor offer any proof as to the truth of the allegation and no showing as to how the defendant was prejudiced even if the unidentified juror did have a homosexual relative. It wasn't until a motion for new trial was filed that counsel presented an affidavit concerning the juror with a homosexual brother, and then it was an affidavit signed by both defense trial attorneys "on information and belief", and not identifying the juror. In their argument on the motion for new trial, defense counsel stated that they learned of the juror's relationship after the panel was picked. "Whether it was before the jury was completely picked or afterwards, I can't remember." They did acknowledge that they knew of the brother and his homosexual reputation, but that they did not know the juror nor the relationship.

■■ From our examination of the *voir dire* record before us, it is apparent that the trial judge granted very wide latitude in the questions that defense counsel were permitted to ask. It seems rather obvious that if defense counsel had inquired more specifically into the background and family of the juror in question, they would have been able to ascertain the relationship. But be that as it may, defense counsel knew of this alleged error from the time of *voir dire* all the way through the prosecution's case in chief, and there was never any offer of proof as to the identity of the juror, the juror's brother, the source of the information nor any reasonable explanation why the defense waited a full five days of jury trial to bring this to the court's attention. Had defense really been serious about this alleged tainted juror, it had more than ample time and opportunity to bring the matter openly and candidly to the court's attention and request substitution of an alternate juror.

■■ The cases cited by the defense, other than *People v. Lobb, supra,* are not in point and do not concern the issue here posed. We have examined at great length the 713 pages of *voir dire* examination before us and we can only conclude that its conduct by the trial judge was in full accord with the provisions of Supreme Court Rule 234 and the case law of this State. Wide scope, extent and latitude of *voir dire* was granted to defendant and opportunity to examine in all reasonable and pertinent areas was afforded. We hold that there was no prejudice to defendant in the conduct of this extensive *voir dire* examination.

Third: *Hearsay.* Defendant next alleges that prejudicial hearsay statements of the deceased were improperly permitted. Objection was made to the testimony of Trooper Boone who related what the decedent had told him. The court heard Boone's testimony and evidence *in camera* and the testimony was substantially as follows: the report from the tow truck driver was received by the Illinois State Police base station at

11:08 P.M., and Trooper Boone arrived at 11:15 P.M.; decedent was lying alongside the road, his shirt covered with blood; Trooper Boone recognized the man, whom he had known for five or six years; decedent responded to the questions of Trooper Boone and told Boone that he had been shot, that he didn't know who shot him, that the man pulled out a gun and asked him for his wallet, and that he did not know where his car was. Another conversation took place between Trooper Boone and the decedent about two hours later at the hospital where he again told Trooper Boone that he did not know who shot him, that he had met this fellow at 5th and Jefferson Streets in Springfield, that they went for a ride around the lake, and that they had not parked. Trooper Dragoo gave substantially the same testimony as Boone. Defense objected on the basis of hearsay and the trial court allowed the objection as to that part of the conversations where decedent said that his attacker pulled out a gun and asked for his wallet; the court permitted all of the rest of the testimony of Troopers Boone and Dragoo.

Parisie contends that the related conversations with the decedent were prejudicial because they were contradicted by defendant's own testimony in three essential respects: (1) decedent said he did not know who shot him; defendant said he had been into decedent's place of business a few weeks earlier and was known to decedent; (2) decedent said he picked up his attacker at 5th and Jefferson Streets; defendant said the meeting occurred on 5th Street, about two blocks north of North Grand Avenue; and (3) decedent said he had not parked the car; defendant testified he did park the car. Consequently, defendant argues that this was prejudicial testimony and that it was not admissible as falling within the *res gestae* exception to the rule as contended by the prosecution.

Both sides to this appeal cite *People v. Poland*, 22 Ill.2d 175, 174 N.E.2d 804, and we now quote from that decision:

"We see no useful purpose to be served in dealing with the problem of using the term 'res gestae.' That amorphous concept has been applied indiscriminately to a multitude of situations, some of which contain no element of hearsay at all, while others involve true exceptions to the hearsay rule. As applied to the situation involved here, we think that the term 'res gestae' not only fails to contribute to an understanding of the problem but may actually inhibit any reasonable analysis. We prefer, therefore, to use less confusing terminology in discussing the problem.

There has emerged, as a recognized exception to the hearsay rule, the principle that, under certain conditions, what have been variously characterized as 'spontaneous declarations' or 'excited utterances' are properly admissible as an exception to the hearsay rule. Perhaps the

classic statement of the reason underlying this exception is that of Wigmore (6 Wigmore, Evidence, 3d ed., sec. 1747):

'This general principle is based upon the experience that, under certain external circumstances of physical shock, a stress of nervous excitement may be produced which stills the reflective faculties and removes their control, so that the utterance which then occurs is a spontaneous and sincere response to the actual sensations and perceptions already produced by the external shock. Since this utterance is made under the immediate and uncontrolled domination of the senses, and during the brief period when considerations of self-interest could not have been brought fully to bear by reasoned reflection, the utterance may be taken as particularly trustworthy (or, at least, as lacking the usual grounds of untrustworthiness), and thus as expressing the real tenor of the speaker's belief as to the facts just observed by him; and may therefore be received as testimony as to those facts.'

The rule has been succinctly stated by the Supreme Court of California: 'When a declaration is made under the immediate influence of the occurrence to which it relates and so near in time as to negative any probability of fabrication, said declaration is admissible.' *Showalter v. Western Pacific Railroad Co.*, 16 Cal.2d 460, 106 P.2d 895, 899.

Three factors are necessary to bring a statement within this exception to the hearsay rule: (1) an occurrence sufficiently startling to produce a spontaneous and unreflecting statement; (2) absence of time to fabricate; and (3) the statement must relate to the circumstances of the occurrence. (6 Wigmore, Evidence, 3rd ed. sec. 1950; Cleary, Handbook of Illinois Evidence, sec. 13.28.)"

And in *People v. Damen*, 28 Ill.2d 464, 193 N.E.2d 25, 29, we find this well-reasoned explanation for this pertinent exception to the hearsay rule:

"A spontaneous exclamation may be defined as a statement or exclamation made immediately after some exciting occasion by a participant or spectator and asserting the circumstances of that occasion as it is observed by him. The admissibility of such exclamation is based on our experience that, under certain external circumstances of physical or mental shock, a stress of nervous excitement may be produced in a spectator which stills the reflective faculties and removes their control, so that the utterance which then occurs is a spontaneous and sincere response to the actual sensations and perceptions already produced by the external shock. Since this utterance is made under the immediate and uncontrolled domination of the senses, rather than reason and reflection, and during the brief period

when consideration of self-interest could not have been fully brought to bear, the utterance may be taken as expressing the real belief of the speaker as to the facts just observed by him."

After citing *Poland, Damen* continues by holding that, "If a statement is a true spontaneous declaration or exclamation, it is admissible, for testimonial purposes, to prove the truth of what was said, in all types of action and not just in rape or related cases." Page 30.

 Spontaneity, of course, is a relative term and will vary under each set of circumstances, case by case. There can be no hard and fast rule in this area, and no precise yardstick of time can be established. Defendant cites the case of *People v. Jackson,* 9 Ill.2d 484, 138 N.E.2d 528, 531, where the court said, "Here, there was a delay of at least an hour, and we have found no case in which statements made after such a lapse of time have been held admissible as a part of the res gestae," and urge that this alone determines that the repeated conversations or statements of the decedent were inadmissible. But to our view, it is not as simple as that. It is not the *time element* that controls, but the existence or lack of spontaneity in the light of the surrounding circumstances that is determinative. We quote from *Wharton's Criminal Evidence,* 12th Edition, (Hearsay Evidence) Sections 280, 281:

"§ 280. *Spontaneous utterances.*

When the *res gestae* rule is applied to spontaneous utterances, it is essential that the declaration be contemporaneous with the event. This is not a requirement of literal contemporaneity, but merely that the declaration be so contemporaneous with the event that the declaration can be regarded as inspired by the event and not by the conscious deliberation of the declarant. As stated by some of the courts, there must be such a spontaneity that the declaration can be regarded as the event speaking through the declarant rather than the declarant speaking for himself. If the court concludes that the declarant was merely narrating what had occurred, the declaration is inadmissible. The fact that the narration by the witness is prohibited cannot, however, be regarded as the exclusive test. A narration is admissible as long as the circumstances are such that the declarant was still under the influence of the shock of the event. Thus, statements made by the victim of a crime to the first person the victim meets after the commission of the crime, in which the victim explains what happened are admissible as *res gestae* although obviously a narration. Statements made in response to questions are admissible as *res gestae* if the person answering was under the influence of the shock of the crime at the time.

\* \* \*

Spontaneous utterances which qualify under the *res gestae* rule are admissible without regard to whether they are statements of the defendant, the victim, or third persons.

\* \* \*

The spontaneous utterance admitted as *res gestae* may be either a sound, such as a cry or shout, or an actual statement of fact, such as 'John shot me.'

§ 281. *Relation to the event; time and distance.*

The acts and declarations claimed to be a part of the *res gestae* may precede, accompany, or follow the transaction to which they relate. But it is only when they precede, accompany, or follow the transaction so as to be wrought up in it and emanate from it, that they can be rightfully regarded as excepted from the rule which excludes hearsay. The time which has elapsed since the event, and the distance which the declarant has traveled from the scene of the crime before making the declaration, is material in determining whether his declaration possesses the necessary spontaneity, but neither mere distance nor time are in themselves controlling. The court must determine whether under all the surrounding cicumstances it is reasonable to believe that the declarant acted without thought, or whether there existed the possibility that the declarant has deliberated and made a false statement. If the court is convinced that the declaration springs from the event and not from calculation, the statement is admissible under the *res gestae* exception."

The hard core and rather stratified approach in *People v. Jackson, supra,* was considerably qualified and tempered by the Supreme Court's opinion in *People v. Poland, supra.* Yet it is still difficult to explain the rather dogmatic statement in *Jackson* that the court had "found no case in which statements made after such a lapse of time (one hour) have been held admissible as a part of *res gestae.*" Perhaps the court referred purely to Illinois cases, since at the time of the *Jackson* opinion in 1956 there existed several Federal and other State cases the permitted *res gestae* statements made two hours, three hours, eleven hours and fourteen hours after the subject occurrences. (*Standard Accident Ins. Co. v. Heatfield,* 141 Fed.2d 648; *Wetherbee v. Safety Casualty Co.,* 219 Fed.2d 274; *Guthrie v. United States,* 207 Fed.2d 19; *State v. Stafford,* 237 Ia. 780, 23 N.W.2d 832.) Each of these cases adhered to the expression voiced in *Wetherbee* that, "The modern tendency of the cases is to extend, not limit, application of the res gestae rule." (219 Fed.2d 274, 278.) And the Iowa case of *State v. Stafford, supra,* which permitted a fourteen hour lapse statement, fairly places this matter in perspective when it points out that "\* \* \* the element of time being of importance

merely as bearing on the question of spontaneity * * * elements to be taken into consideration * * * time which has elapsed; the length of time; whether the time is or is not definitely stated; the place of the act or statement; the condition of the declarant; the influence of intervening occurrences; and the nature and circumstances of the statement * * * but the real test is not whether the declarations are in point of fact contemporaneous, but whether the circumstances exclude premeditation and design * * *. The facts and circumstances of no two cases can be precisely alike, and the exact length of time is not mathematically controlling." 23 N.W.2d 832, 835-836.

But of striking similarity to the case on review is that of *Lampe v. United States* (D.C. Cir. 1956), 229 Fed.2d 43. There, the victim suffered a vicious attack by two men in which he was beaten into insensibility. "Shortly after he regained consciousness," he was found by two police officers in a dazed condition, breathing with difficulty, badly beaten and although his speech was partly incoherent, it was understandable. The police officers asked him what had happened and he said "Get me to a hospital * * * I have been beaten up by two men," naming them. That was the first statement. About forty minutes later at the police station the victim made a second statement wherein he said that both of the men had taken part in the beating. Approximately six hours later in the hospital the victim gave a third statement to a police officer relative to the beating. *Quaere:* Were these statements erroneously received in evidence, and, if so, were they prejudicial?

The first statement was held admissible. The evidence there, as here, did not demonstrate or reflect the period of time between the alleged act and the police finding the victim and talking to him. The victim, who later died, was suffering from numerous and severe external and internal wounds, and was several blocks away from the site of the beating. His statements to the police officer were also conducted by the question and answer method.

The second statement was made some forty minutes after the first and the court stated that "* * * we should be inclined to hold that it also was properly received as a spontaneous declaration were it necessary to pass upon its admissibility. There had been no opportunity for reflection. LaMar had had no medical attention and must have been suffering from his grievous wounds even more than when he first talked to the police. But, even if the second statement was not spontaneous, admission of testimony concerning it was not prejudicial error since it added nothing to the admissible earlier statement." (Pages 45-46.)

Now for the third statement some five and a half—six hours after the second: Unquestionably hearsay, lacking any spontaneity to qualify it

for admission. He had been under medical care in the hospital for several hours and the court found that it could not "say this later statement was uninfluenced by reflection." But the question then was "whether the admission of this third and undoubtedly inadmissible statement was prejudicial to Lampe." The court concluded that the last statement added nothing of significance to either the first or the second. Lampe had confessed to his part in the beating and the court said that "The appellant can hardly say he was prejudiced by the admission of a bit of testimony which merely tended to confirm what he himself freely admitted." Page 46.

■■■ Indeed, since the turn of the century, Illinois has recognized that in order to be considered part of the *res gestae* it is not mandatory that declarations must be precisely concurrent with the primary occurrence in point of time, as long as they are made at a time so near it as to preclude the thought of deliberate design or calculated fabrication. (*Davids v. People*, 192 Ill. 176, 189.) In the case before us no one knows how much time elapsed between the shooting at the lake and the time Trooper Boone had his first conversation with the decedent. But the record does reflect the circumstances surrounding the incident: the victim was lying alongside the road with his shirt covered with blood; he knew he had been shot and asked for medical aid; he was suffering from three bullet wounds which eventually led to his death; he was dazed and in a state of shock. Although the time lapse between the shooting and the confrontation with Trooper Boone may indeed have been more than one hour (or less, for all we know), we believe that the circumstances here surrounding demonstate that neither the opportunity nor the probability of fabrication, calculation or deliberate design were available to the decedent in his physical state. We conclude that they were sufficiently a part of *res gestae* as to come within the exception to the hearsay rule.

■■ Now for the second conversation, which was in the hospital emergency room, some two hours after the first conversation with Troopers Boone and Dragoo. Here, we are persuaded that such a lapse of time is very nearly determinative that this second conversation is so far removed from the occurrence, *i.e.*, the shooting, that it cannot be considered as part of the *res gestae*. Consequently, it does not fall within that exception and the exclusionary hearsay rule required that it not be admitted in evidence. But although it was hearsay and inadmissible, was the content of the inadmissible evidence and hearsay of such magnitude as to require reversal? We think not.

Defendant claims that the decedent's statements that (1) he didn't know who shot him, (2) he picked up his assailant at 5th and Jefferson

Streets, and (3) he did not park the car, were all "directly contrary to the defendant's testimony." This is not specifically correct, since it was the defendant who contradicted the statements of decedent adduced in the prosecution's case in chief. Defendant points primarily to *People v. Jackson, supra,* but we find that case easily distinguishable from the one before us. Without going into the facts in that case, a quick reading of it will demonstrate that: the hearsay statements were prejudicial on their face; the statements revealed damaging information about the defendant that was completely uncorroborated by any other evidence in the trial; highly inflammatory photographs of the victim after autopsy were displayed to the jury; and the case was tried at a time when the jury fixed the penalty as well as determined the question of guilt. In this case, the statements were not prejudicial on their face, defendant admitted that he shot the victim, there was corroboration of the primary issues in the proof, there were no inflammatory photographs involved in this prosecution and the jury no longer was faced with the duty of fixing penalty or punishment.

The case of *People v. Wright,* 65 Ill.App.2d 23, 212 N.E.2d 126, is also relied upon by defendant. But again, this case is distinguished from the one before us. There, "The sole evidence involving defendant in the crime was the testimony of the complaining witness. The effect of such additional statements was to give the impression to the jury that the evidence against defendant was corroborated." (Page 128.) That case appears to us to be totally inapplicable in view of the fact that defendant admitted shooting the decedent.

■■ As to decedent's statement (1) that he didn't know who shot him, this was exactly a repeat of a similar statement at the first conversation which we have held admissible. Therefore, it is merely cumulative proof and therefore harmless. As to his statement (2) that he picked up the defendant at 5th and Jefferson Streets, whereas the defendant says two blocks north of North Grand Avenue on 5th Street, this is on the same street but at a different intersection. We cannot say that this is at such variance on a visceral issue that reversible prejudice occurred. This too was harmless. And although decedent said (3) that he had not parked, and defendant said he did, it seems rather mundane that a person who removes himself from behind the wheel of a car that he is driving, after having been shot, and wanders on a road, cannot accomplish this without the car having "stopped" or been "parked". Whether it is merely a semantical difference or a question of interpretation and definition, it had no bearing upon a touchstone issue in the trial.

■■ It was error for the trial court to admit into evidence the second conversation between the State Troopers and the decedent at the

hospital. But it was not, to our view, reversible error. None of the statements were prejudicial on their face nor were directed to the shooting of the decedent—this was admitted by the defendant. At best, one question was cumulative, and they were all harmless under the circumstances of this case.

■■ One additional minor point before we leave this issue. Defendant also complains of the manner in which the statements were made. That is, the State Trooper would ask a question and the decedent would answer it. Defendant claims that the spontaneity is destroyed by this question-and-answer method. However, we hold with that line of authority which has ruled otherwise. In *People v. Damen, supra,* the court held that "The fact that the officer asked complainant 'what happened' is, we believe, insufficient to destroy its spontaneity." (Page 30.) And the facts before us would certainly indicate that the following statement in *Wharton, supra,* is also applicable: "Statements made in response to questions are admissible as res gestae if the person answering was under the influence of the shock of the crime at the time." Page 633.

Fourth: *Homosexuality.* Specifically, defendant charges that the trial court improperly refused to admit defendant's proffered evidence that the victim had a reputation in the community as a known, overt homosexual. In short, two questions must be asked: were the form and the substance of the tendered evidence proper? Equally short, the answer to both is no.

■■ Defendant offered three witnesses to testify relative to decedent's homosexual reputation. All three witnesses were called to the stand, gave their names and their addresses, and then objection by the prosecution to their further testimony was sustained. The only offer of proof made by defense counsel as to what they would testify to came from defense counsel themselves. In the case of the first witness, defense counsel merely stated in chambers that the first witness would testify to three specific acts of homosexuality with the deceased and that the decedent's reputation in the community was that of a homosexual. There was not even that much offer of proof on the other two witnesses, since counsel simply stated that they adopted as offer of proof the affidavit previously filed. When we turn to that affidavit we find that it is one executed by one of defense counsel, containing a mere recitation that the two witnesses had seen decedent in known homosexual locations. The "offer of proof" regarding all three of these witnesses is patently inadequate. They amount to nothing more than conclusionary, broad-sweeping statements of defense counsel and offer no acceptable foundation for admission as reputation evidence. "This court, on numerous occasions, has held that reputation witnesses must be shown to have adequate

knowledge of the person queried about and that evidence of reputation, to be admissible, must be based upon contact with the subject's neighbors and associates rather than upon the personal opinion of the witness." (*People v. Moretti*, 6 Ill.2d 494, 129 N.E.2d 709, 725.) Obviously, the form in which this offer of proof comes to us is insufficient to accommodate the well settled state of the law in this area.

Yet, assuming that the manner in which the issue is presented were satisfactory, what of the substance, *i.e.*, decedent's reputation as a homosexual? How is it germane to the defense in this case? In his opening statement, defense counsel stated:

> "Ladies and gentlemen of the Jury, our client, John Parisie, the 19 year old boy that sits here at the table, has authorized us to tell you that his hand pulled the trigger of the gun that killed (decedent) * * * when * * * John Parisie pulled the trigger of the gun that killed (decedent) * * * he did so while repulsing a homosexual attack * * *."

The case was tried, and the appeal is grounded, on the sole defense of insanity. Yet, although there was ample expert testimony that Parisie was a latent homosexual, as our Supreme Court has opined "* * * that condition has in no way been equated in the law with insanity or incompetency." (*People v. Jones*, 43 Ill.2d 113, 251 N.E.2d 195, 199, see also *People v. Jones*, 6 Ill.2d 252, 128 N.E.2d 739, 740-741.) Nor does the alleged homosexual advance in and of itself have any bearing whatever upon a claim of self-defense. (*People v. Herron*, 125 Ill. App.2d 18, 260 N.E.2d 428.) The cases cited by defendant to support his position that reputation evidence should have been admitted are not in point. Two involved murder cases in which the defense was self-defense and reputation evidence of decedent's violent disposition was improperly excluded. Another was a rape case where the defense was consent and the court excluded reputation evidence as to the chastity of the prosecuting witness. We have no quarrel whatever with any of these cases cited by the defendant because they state most correctly the law. A murder victim's quarrelsome reputation is indeed material when the defense is self-defense, and the chastity reputation of the prosecuting witness in a rape case is indeed material when the defense is consent. But we are aware of no authority whatever which even hints that a reputation for homosexuality of a murder victim is a material issue when the sole defense is that of insanity. In *People v. Allen*, 50 Ill.2d 280, 284, 278 N.E.2d 762, 765, the court said that, "Before defendant may introduce evidence concerning the violent character of the victim, some foundation must be first laid by introduction of evidence of self-defense." It appears to us that the identical reasoning holds true as to any type

of reputation evidence in *any* criminal prosecution. The materiality of the reputation evidence to the defense raised must be shown before it is admissible. How the proffered reputation evidence here is either relevant or germane to the defense issue of insanity escapes us.

Fifth: *Collateral impeachment.* Defendant alleges that the court erred in permitting the prosecutor to collaterally impeach the defendant by showing that Parisie had lied in filling out an employment application. On direct examination, the defendant testified that he had a job with a photographic studio in Springfield and that he worked there for a week. When asked by his counsel what the cause of his termination of employment was, Parisie replied, "They found out on my application about the divorce—between my wife and I." On cross examination, the prosecutor asked defendant if he made out an application for employment at the photographic studio, to which Parisie answered in the affirmative. The prosecutor then proceeded to have Parisie identify a document as a copy of that application for employment and inquired as to certain information contained therein. The cross examination revealed that Parisie had put on the application that he was a member of the Amvets (which he admitted he was not), and that he had worked for a certain employer for eleven months (whereas he only worked for maybe three months).

■■■ We find no merit in defendant's contention. The subject here was broached by defendant himself in his own direct testimony examination and the prosecution's cross examination was nothing more than a fair and honest elaboration of the details for the purpose of impeachment. People's cross examination did not violate the limits of the direct testimony—and it was patently relevant to the question of the defendant's believability and veracity. Cross examination is, indeed, the proper time when a defendant may be asked about details which would throw light on the facts to which he testified in his examination in chief. Once the accused takes the stand in his own behalf in a criminal case, he tenders both his reputation and character as a direct issue and subjects his credibility to a legitimate and pertinent examination by the same tests as applied to any other witness. (*People v. Miller,* 13 Ill.2d 84, 148 N.E.2d 455, 468; *People v. Provo,* 409 Ill. 63, 97 N.E.2d 802, 805.) Somewhat similar on the point before us is *People v. Bernette,* 45 Ill.2d 227, 258 N.E.2d 793, 800-801, where the prosecution cross examined a defendant in a murder trial regarding false statements that he had made in his application for employment relative to inconsistent statements that he had never been convicted of a crime. The court held that the prosecution's right to question the defendant's " * * * veracity by this means cannot be disputed."

■■ Furthermore, the prosecutor had every right to refer to this matter in final argument where he characterized Parisie as "a liar", having "lied as to his employment", and as to "the organizations he belonged to." Such interpretation of the evidence by the prosecutor was unquestionably within his prerogative under the state of the testimony from the defendant himself.

Sixth: *Polygraph test.* Defendant contends that when a state's rebuttal witness testified that he, the witness, had taken a polygraph test, prejudicial error was committed. After Parisie testified, the state called a friend of his, Bill Watson, with whom the defendant had resided while in Springfield. Watson testified that defendant's reputation in the community for truth and veracity was bad and that he would not believe the defendant under oath. On cross examination by the defense, it was established that Watson himself had been investigated in connection with this case and that he had spoken with members of the state's attorney's staff upon a number of occasions. Thereafter, on redirect examination by the prosecutor, the following colloquy took place:

"Q. Mr. Watson, during the time that you were talking to the State's Attorney's Office with reference to this case, did you take any tests?

A. One—for the State's Attorney's Office?

Q. Yes.

A. I took a polygraph test.

Q. Do you know what the results of that polygraph test were?"

Defense counsel immediately moved to strike the question and answer, and also moved for a mistrial. The court granted the motion to strike, but refused to declare a mistrial.

■■ There is no question but that both the giving of a polygraph examination, as well as the results of such a test, are inadmissible in evidence as proof of either the guilt or innocence of a defendant, except by stipulation. The case law is unquestionably in accord. (*People v. Nicholls*, 44 Ill.2d 533, 256 N.E.2d 818, 822; *People v. Zazzetta*, 27 Ill.2d 302, 189 N.E.2d 260, 263.) But the facts in issue here do not bring us within the gamut of the general rule. The testimony regarding the taking of the polygraph test was purely with reference to the *witness* and *not* the *defendant.* It did not go to any material issue as to defendant's guilt or innocence of the offense of murder. The People argue that the net effect of defense counsel's cross examination of Watson was to insinuate that he was testifying against his friend since he had been implicated himself in the crime and that by testifying in the case he was avoiding further involvement with the authorities. On the posture of the direct and cross examination of Watson, we accept this as an arguable position.

● 39, 40 Be that as it may, no authority has been cited to us, nor are

we aware of any, holding that testimony by a witness that *he* has submitted to a polygraph test is so prejudicial to the defendant that reversible error has been committed. Indeed, the Illinois Supreme Court has held that evidence concerning a *defendant's* having taken a polygraph test, even though inadmissible, was minor, harmless and certainly not reversible error. (*People v. Bernette*, 45 Ill.2d 227, 258 N.E.2d 793, 801; *People v. Flowers*, 14 Ill.2d 406, 152 N.E.2d 838, 843; *People v. Melquist*, 26 Ill.2d 22, 185 N.E.2d 825, 829.) Here, the court sustained the objection to the witness's answer that he had taken a polygraph test, (there was no answer as to what the results of the test were) and the court instructed the jury to disregard the testimony. We are of the opinion that the error here, *if any*, is harmless and most certainly not of sufficient prejudice to the defendant to be reversible.

Seventh: *Widow's testimony*. Defendant claims he was denied a fair trial when the victim's widow was permitted to testify that the decedent left three children. The widow was the last witness called by the State in its case in chief, and the very last question that she was asked before cross examination was, "How many children do you have?" To this, she answered "Three." There was no objection to the question or answer, there was no cross examination by defense counsel on this subject. We have read *in toto* the final arguments of both the prosecution and defense and find at no point therein any reference whatever to the testimony regarding the children.

■■■■ That this question and the answer were error is unquestioned. The cases cited by defendant (*People v. Bernette*, 30 Ill.2d 359, 197 N.E.2d 436; *People v. Dukes*, 12 Ill.2d 334, 146 N.E.2d 14; *Filippo v. The People*, 224 Ill. 212) correctly state the Illinois rule: evidence that a murder victim left a widow, children or family is inadmissible since such evidence has no relationship to either the guilt or innocence of the defendant, and usually serves only to create prejudice against him in the eyes of the jury. This is the rule, and with it we do not quarrel. But there is more to it than that. The mere mention of the victim's family (and that is utterly all that was said here) is not automatically reversible since under the given facts in a situation the statement can be completely harmless. *People v. Golson*, 32 Ill.2d 398, 207 N.E.2d 68, 74-75; *People v. Brown*, 30 Ill.2d 297, 196 N.E.2d 664, 667; *People v. Holland*, 75 Ill.App. 2d 460, 220 N.E.2d 639, 640; *People v. Vasquez*, 118 Ill.App.2d 66, 254 N.E.2d 617, 621.

■■■ The single question and single answer before us were not expanded beyond the record here quoted. There was no cross examination and there was absolutely no reference whatever by any of counsel to the subject again. It was, to our view, isolated, inadvertent, unplanned and

a careless slip of the tongue. It was never again referred to. It was not presented in any manner as to cause the jury to believe that it was material, it was not accompanied by sympathetic references to the ages of the children, there was no inflammatory final argument playing upon sympathy for the orphaned offspring, and the subject was abandoned immediately. Error, to be sure—but harmless. *People v. Jordan,* 38 Ill.2d 83, 230 N.E.2d 161, 166.

Eighth: *Victim's bloody clothes.* Finally, Parisie contends that the prosecutor's sudden display of the bloody clothes of decedent before the jury, both during his cross examination of the defendant and again in final argument, was prejudicial and a denial of fair trial to Parisie. Defense counsel's position is that since Parisie admitted that he had killed decedent, the admission into evidence of the bloody clothes "would only serve to inflame the passions of the jury." Defense counsel on appeal goes so far as to allege that the prosecution exhibited the bloody clothes in front of the jury in order "to evoke emotions of unthinking revenge from the jury" and that "its only purpose the cynical one of playing upon the jury's basic emotions of retribution." We find both the argument and the characterizations to be baseless and without merit.

During the State's case, the bloody clothes of the victim (shirts, shorts, trousers, socks, shoes) were contained in a box and were identified and testified to by a state trooper, an emergency room nurse who cut most of the clothing off of the victim, the physician who performed an autopsy on the decedent, and two state crime laboratory technicians who examined the clothing. The articles were left in the box while all of these prosecution witnesses testified and none of the articles were removed from the box in the presence of the jury. However, when defendant took the stand and was being cross examined, the prosecutor removed some of the articles from the box and exhibited them to the defendant and to the jury, without objection by the defense. Earlier, at the time that the prosecutor was presenting the clothes for identification in his case in chief, defense objected to the line of questioning and the clothes. The prosecution argued then, and argues now, that the clothing was very properly part of the evidence of the crime, and had probative value regarding the circumstances surrounding the shooting and the issue of believability of the defendant. It was, and is, arguable that the clothing, with the blood and the bullet holes, showed the lineup of bullet holes in the body, revealed that the victim bled a great deal, reflected that he was fully clothed, is relevant to other evidence of the amount and location of blood in the automobile and certainly has a bearing upon defendant's version of how the shooting occurred.

*People v. Janko,* 410 Ill. 478, 102 N.E.2d 783, 785, involved a murder prosecution, a confession and a defendant whose mental capacity was placed in issue. In that case the trial court permitted into evidence photographs taken of the deceased girl's body at the hospital showing the wounds, and permitted them to be shown to the jury. The Illinois Supreme Court affirmed, saying:

"The fact and cause of death, the number and location of the wounds, the manner in which they were inflicted, and the willfulness of the acts in question are all material to the offense charged * * *. Evidence having a natural tendency to establish the facts in controversy should be admitted. A party cannot have competent evidence excluded merely because it might arose feelings of horror and indignation in the jury. Any testimony concerning the details of a murder or other violent crime may have such tendencies, but manifestly this could not suffice to render it incompetent. Of course, where spectacular exhibits having little probative value are offered for the principal purpose of arousing prejudicial emotions they should be promptly excluded. But questions relating to the character of the evidence offered, and the manner and extent of its presentation, are largely within the discretion of the trial judge, and the exercise of that discretion will not be interfered with unless there has been an abuse to the prejudice of the defendant. Such is not the case here." p. 785.

■■ The opinion in *Jenko* clearly reflects the majority view, and accord therewith was again asserted in *People v. Ciucci,* 8 Ill.2d 619, 137 N.E.2d 40, 44, where the court held that it was no abuse of discretion for the trial judge to admit as exhibits certain bloodstained bedclothing. "The general rule is that whatever tends to prove any material fact is relevant and competent * * *. There was no error in admitting the evidence in question, nor did the court err in permitting the jury to take the exhibits to the jury room. Whether particular exhibits bear directly on the charge, and hence may be taken to the jury room, is a matter resting largely in the sound discretion of the trial judge." (Page 44) Furthermore, we have read all of the final arguments and are of the distinct opinion that the prosecutor's comments regarding the clothing, and the interpretation that he placed upon the evidence properly admitted, was well within proper bounds. No error.

Hence, we come full circle, back to the beginning. It was not a perfect trial—but it was a *fair* one. And that is all that man's law can bestow.

Judgment affirmed.

SMITH, P. J., concurs.

Mr. JUSTICE CRAVEN specially concurring:

I concur in the result reached in this case and the reasoning set forth in that portion of the opinion designated part four in that the case was tried and the appeal is grounded on the defense of insanity predicated upon the fact that the defendant, a latent homosexual, was not criminally responsible for his conduct while repulsing an asserted homosexual attack. The evidence in this case does not establish lack of criminal responsibility nor incompetency on the part of the defendant. "Homosexual panic" has in no way been equated with insanity or incompetency. *People v. Jones,* 43 Ill.2d 113, 251 N.E.2d 195.